IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**MIDWEST INSULATION SERVICES INC.**

      **Plaintiff on Behalf of Itself
And Those Similarly Situated**

         **v.**

**JOHNS MANVILLE CORPORATION,**

      **Defendant.**

---

## CLASS INJUNCTIVE AND DAMAGE COMPLAINT

---

      Midwest Insulation Services Inc. ("Plaintiff") brings this action on behalf of itself and similarly-situated United States purchasers of calsil thermal pipe insulation sold by Johns Manville Corporation ("JM") through its United States distributors. It seeks class injunctive relief under federal monopolization law and the law of estoppel for indirect calsil purchasers, as well as damage relief for an indirect purchaser damage class pursuant to State indirect-purchaser, monopolization law and the law of estoppel. It alleges as follows:

### PRIOR PROCEEDING IN THIS COURT GIVING RISE TO
### ESTOPPEL AS TO JM MONOPOLIZATION

      1.    In the federal matter *Chase Manufacturing, Inc. v. Johns Manville Corp.* No. 19-cv-00872 -MEH (D. Colo.), the jury found that JM has monopolized an antitrust calsil relevant market under Sherman Act, 15 U.S.C. § 2. Ex. A hereto. The market encompasses the sale in the United States of calsil thermal pipe insulation used by industrial facilities, including power plants

and oil refineries, to insulate pipes transporting materials at temperatures up to 1200 degrees Fahrenheit. On May 14, 2024 the District Court entered a $21 million Final Judgment awarding treble lost profit damages to plaintiff Chase Manufacturing, Inc. (doing business as Thermal Pipe Shields, Inc.) ("TPS"), a JM competitor. Ex. B hereto. The judgment was subsequently adjusted by the Court to $18.45 million. Ex. C hereto.

2.      The *Chase Manufacturing* judgment gives rise to collateral estoppel as to the monopolization violation for the benefit of the proposed federal injunctive class alleged herein, and the indirect purchaser damage class alleged herein under State monopolization law. As to the latter, Plaintiff as proposed class representative will show this Court the antitrust price injury and damages materially caused to members of the class by the established JM monopolization. Under the law of collateral estoppel, JM is barred from relitigating that it has monopolized the United States calsil relevant market.

## THE JM MONOPOLIZATION

3.      In the alternative, Plaintiff will show the Court as follows. Industrial facilities transitioned away from asbestosis in the 1970s to safer insulation alternatives, including calsil. Calsil is "hydrous calcium silicate" that can be form-fitted for diverse sizes and shapes of industrial equipment, such as pipes and tanks. It is heat-resistant, durable, noncombustible, and anticorrosive.

4.      JM is the dominant purveyor of this calsil thermal pipe insulation in the United States with a 97% market share in the calsil relevant market. JM is also the exclusive manufacturer of calsil in the United States.

5.      Until 2018, JM was not only the sole United States calsil manufacturer but also the exclusive domestic calsil supplier. It sells calsil to JM thermal-pipe-insulation distributors in the

2

United States including those in Nebraska. In turn, these United States JM distributors sell calsil to industrial users and insulation contractors ("indirect purchasers") based on project specifications.

6.      In March 2018, TPS entered the United States calsil market with a competing product. As did JM's calsil, TPS's complied with ASTM standards, withstood temperatures up to 1200 degrees Fahrenheit, and allowed for formfitting for various industrial uses.

7.      TPS's calsil came with other advantages. For one, TPS priced its calsil 20% to 25% less than JM priced its calsil. For another, because TPS used a different manufacturing process than JM, TPS's calsil was stronger and more flexible.

8.      Recognizing a competitive threat from an arguably superior, lower priced product JM acted to maintain unlawfully its calsil monopoly in violation of the Sherman Act, 15 U.S.C. § 2 and the State monopolization laws as alleged herein.

## JURISDICTION AND VENUE

9.      Injunctive relief from ongoing monopolization is sought pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. Pursuant to the indirect-purchaser, monopolization law of the States as alleged herein, Plaintiff also seeks class damage relief pursuant to this Court's supplemental jurisdiction, 28 U.S.C. § 1367.

10.      This Court has subject matter jurisdiction over the injunction and damage claims pursuant to 28 U.S.C. § 1331 and Section 16 of the Clayton Act, 15 U.S.C. § 26 and its supplemental jurisdiction, 28 U.S.C. § 1367.

11.      This Court has personal jurisdiction over the Defendant because it resides in this District; transacts business in this District; and commits overt acts in furtherance of unlawful

3

conduct in this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because the Defendant resides, transacts business, has been found, and has agents in this District; and a substantial portion of the affected interstate trade and commerce at issue has been carried out in this District. In addition, Plaintiff as proposed class representative seeks remedy in part for Colorado indirect purchasers resident in this District.

**PARTIES**

13.     Plaintiff Midwest Insulation Services Inc. is an indirect purchaser of JM calsil resident in Omaha, Nebraska which has been purchasing substantial amounts of JM calsil from JM distributors over the last four years. As a proposed class representative, it seeks damage remedy under the indirect-purchaser, monopolization law of Nebraska, as well as under other State monopolization laws alleged herein. It also seeks federal injunctive relief.

14.     Defendant Johns Manville Corporation is organized under the laws of Delaware, with its head office located in Denver, Colorado. It is a wholly-owned subsidiary of Berkshire Hathaway, Inc. JM manufactures and sells construction products, including mechanical insulation products such as calsil.

**STANDING AND CLASS ADEQUACY OF REPRESENTATION**

15.     Over many years to the present, JM has continued to exclude calsil competition in the relevant market. As a consequence, its monopoly prices charged for calsil to its distributors are passed on all or in part to members of the State indirect purchaser class purchasing from these JM distributors. These passed-on monopoly prices are substantially above competitive levels. The Plaintiff as proposed class representative, and other members of the damage class of indirect

4

purchasers of JM calsil alleged, all suffer antitrust price injury materially caused by JM's monopolization.

16.    In *Chase Manufacturing* the judgment only awarded TPS lost-profit damages trebled. The extent of monopoly overcharge antitrust price injury and damages to be shown herein inflicted on the indirect purchase damage class were not at issue, and the overcharge remedy sought here does not overlap with the TPS remedy in any way.

17.    This antitrust price injury to be shown is of the type the federal and State antitrust laws are plainly intended to prevent and flows from the exclusionary conduct making JM's acts unlawful.

18.    JM's misconduct has materially caused passed-on antitrust price injury to Plaintiff as proposed class representative. Plaintiff is motivated to enforce the State monopolization law of Nebraska, and the monopolization laws of the other States alleged herein, because it has the natural economic self-interest in paying competitive, rather than monopoly, supra-competitive prices.  As a consequence, it has standing to assert such claims for indirect-purchaser class members in other States as alleged, as well as its own State.

19.    Any differences among the monopolization laws of all States alleged do not defeat the standing of the Plaintiff as proposed class representative to assert similar monopolization remedy under all the State antitrust laws alleged.

20.    The Nebraska monopolization claim of the Plaintiff as proposed class representative closely parallels those claims of other State class members in other jurisdictions because, assuming a proper damage class is certified, success of its claim under Nebraska's monopolization law will dictate success under other State monopolization laws alleged because all

these State laws are typically construed consistent with a federal monopolization claim under the Sherman Act, 15 U.S.C. § 2.

21.    Under all State monopolization laws alleged, all class members have been forced to pay supra-competitive, monopoly pricing due to the JM monopolization of the calsil relevant market and have a substantial and shared interest in proving that the passed-on monopoly pricing is the material result of unlawful JM monopolization redressable by an award of antitrust damages.

22.    The judgments for class members entered under the monopolization laws of States, other than the Plaintiff's Nebraska judgment, are materially the same as the Nebraska judgment and have no relevant bearing on the personal stake of the Plaintiff in litigating the case to secure all class judgments.

## RELEVANT MARKET

23.    The relevant calsil product market encompasses the sale of calsil insulation pipe and block products. "Calsil" refers to hydrous calcium silicate thermal insulation that is factory formed into flat blocks or in curved sections designed to encapsulate pipes, equipment or tanks. It is manufactured in accordance with ASTM C533 Type I. ASTM International is an international standards organization publishing material specifications widely used by engineers to qualify generic product types.

24.    Calsil replaced asbestos as the industry standard for mechanical insulation in mid-high temperature applications starting around 1973. The applications include piping, tanks, and other equipment that operate at temperatures up to 1200° Fahrenheit within large industrial facilities, such as oil refineries, chemical and power generation plants and pulp and paper mills.

25.     Because of its unique physical properties, calsil is extremely heat resistant and provides very high compressive strength to resist damage and physical abuse much better than other products. Its extreme durability provides long service life by preventing crushing due to on-site foot traffic and abuse; it is inherently non-combustible; it generates no smoke when exposed to flame, which provides passive fire protection; contains integral corrosion-inhibiting chemistry; and it offers low thermal conductivity to prevent heat loss and reduce the surface temperature of insulated surfaces, characteristics that protect workers from burn injuries in the plant.

26.     These special attributes of calsil make it the essential insulation for mid- to high-temperature piping and equipment because there are no reasonably interchangeable substitutes that provide the same combination of physical properties with the accompanying benefits that meet the requirements of ASTM C533 Type I: Standard Specification.

27.     Based on performance characteristics and life cycle cost, industrial project engineers specify calsil because there are no reasonably interchangeable substitutes and calsil is a distinct product market.

28.     The demand for calsil is national and it is sold to JM distributors at their respective locations throughout the United States. As a result, the relevant geographic market for calsil is the United States.

29.     At one point there were eight United States calsil factories owned by competing manufacturers. But over time, through plant closures, and every other manufacturer exiting the market, JM now owns and operates the only two remaining calsil factories in North America.

30.     Currently, JM has a market share of 97% of the United States relevant calsil market protected by substantial barriers to entry.

31.     To be used and accepted by customers, calsil must meet North American market requirements, meaning it must meet or exceed all physical properties in accordance with ASTM C533 Type I specifications. This standard creates a significant barrier to entry. There are only three factories in the entire world that can produce calsil that not only meets all applicable ASTM C533 Type I requirements, but also produce with North American sizing norms for both length and dimensional tolerances in accordance with ASTM C585: Standard Practice for Inner and Outer Diameters of Thermal Insulation for Nominal Sizes of Pipe and Tubing. Two of those factories are in the United States and both are owned by JM.  The third is in Shanghai, China, which sells its calsil in North America exclusively to TPI.

## EXCLUSIONARY CONDUCT

32.     JM has excluded competition to charge monopoly calsil pricing as a result of its control of calsil distributors and its ability to impede the growth of its only competitor, TPS. Robert Hlavenka, senior vice president of strategic sourcing for the large distributor Distribution International, Inc. has testified that his distributor continued to buy 99% of its calsil from JM after TPS entered the market. This was so despite his belief "that the TPS product is a superior product ... t[o] the JM product." Employees from another distributor, Bay Insulation, have testified that JM could "simply raise the price to put [calsil] out of reach." And both Hlavenka and Joseph Guest of distributor 4-State Supply, Inc. have testified their companies could not stay in business without access to JM's products. Hlavenka put it this way:

Q. Does [Distribution International] feel that it could decide not to do business with JM across the board?

8

A. I don't think that we can do without JM.

Q. Why is that?

A.  Because we have a lot of markets that we're supplying their product, and we -- we can't get the other suppliers to support us in those markets.

33.    JM has maintained its market power in the domestic calsil market for more than three years after market entry of its only competitor TPS.  JM makes much higher gross margins on calsil compared to its other thermal-insulation products (in which it faces competitive markets). This is the same for JM's United States calsil sales as contrasted to its international calsil sales in more competitive markets.

34.    JM Has sufficient economic power over its distributors and other direct customers in the United States to impede TPS's market growth. Distributors have continued to purchase JM's calsil despite earning significantly higher profits on calsil purchased from TPS.

35.    Until 2018 JM was not only the sole United States calsil manufacturer, but also the exclusive domestic calsil supplier. It sells calsil to its distributors in the United States.  In turn these distributors resell calsil to class indirect purchasers such as insulation contractors such as Plaintiff based on project specifications.

36.    In March 2018 TPS entered the United States calsil market with a competing product under the brand name TPSX-12. As does JM's calsil, TPS's complied with ASTM standards, withstood temperatures up to 1200 degrees Fahrenheit, and allowed for formfitting for various industrial uses.

37.    Further TPS's calsil came with substantial competitive advantages. For one, TPS priced its calsil 20% to 25% less than JM priced its Thermo-1200. For another, because TPS used

a different manufacturing process than JM, TPS's calsil was stronger and more flexible.

38.    Distributors started purchasing TPS product and some believed TPS calsil was superior to the JM product. Bay Insulation Supply Inc., one of the five largest JM national distributors of calsil, agreed to serve as TPS's exclusive calsil supplier for two California regions. Two smaller distributors, APi Distribution and GLT Fabricators, reached similar exclusivity agreements with TPS for small regions elsewhere in the United States. Between 2018 and August 2021, TPS sold more than $2.3 million in calsil to nine distributors, including some to each of the five largest distributors. Twenty-two other distributors kept buying calsil exclusively from JM.

39.    JM immediately recognized the threat TPS's less expensive and arguably superior calsil posed to its complete monopoly. It responded to TPS's market entry with two anti-competitive gambits aimed at maintaining its monopoly by coercing distributors not to buy TPS's calsil and by disparaging the quality of TPS's calsil to distributors by falsely raising concerns about asbestos and silica particles.

**Coercing Distributors to Exclude Competition**

40.    Both JM and TPS sell mechanical insulation products, including calsil, almost exclusively through distributors. There are five major mechanical insulation distributors that dominate nationwide. These five distributors each operate in at least 28, and in some cases as many as 66, different locations throughout the country. Between them, the five largest distributors operate in 218 locations nationwide. In many areas, there are no alternative sources of the mechanical insulation products that they distribute.

41.    Each of these five JM distributors purchases calsil and other mechanical insulation products nationally, and together these five distributors account for approximately

85% of mechanical insulation sales. The five largest distributors are: Distribution International, Inc. (DI), headquartered in Houston, Texas and which purchases a range of mechanical insulation products in 66 locations in 29 states nationwide; Specialty Products & Insulation Co. (SPI), headquartered in Lancaster, Pennsylvania, purchases a range of mechanical insulation products in 49 locations in 25 states nationwide; General Insulation Company, Inc. (GI), headquartered in Medford, Massachusetts and which purchases a range of mechanical insulation products in 46 locations in 23 states nationwide; MacArthur Co., headquartered in St. Paul, Minnesota, purchases a range of mechanical insulation products in 29 locations in 12 states nationwide; and Bay Insulation Supply Inc. (Bay Insulation), headquartered in Green Bay, Wisconsin, purchases a range of mechanical insulation products in 28 locations in 14 states nationwide.

42.      An internal JM email, sent days after TPS's market entry, advised JM's sales force: "[i]f we need to bring the sword, then '[if] you [the distributors] choose to buy material from Thermal Pipe Shields, then that will significantly alter your company's relationship with Johns Manville as a mechanical insulation partner.'" In another March 2018 internal email, a JM manager coached his sales team to stress TPS's "foreign manufacturing," JM's superior "support after the sale," Thermo-1200's better "water-resistance," and TPSX-12's lack of "testing."

43.      JM closely monitored TPS's calsil sales to distributors and worried about the competition. For instance, in a June 2018 internal email—subject line: "MacArthur buying from TPS???"—a JM manager lamented the large distributor's possibly having bought calsil from TPS. And in a November 2018 internal presentation, JM employees conceded that Thermo-1200 "h[e]ld no competitive quality or price advantage" over TPSX-12. They also posed a market-share

hypothetical envisioning that JM could lose significant market share against TPS's less expensive and arguably superior calsil.

44.    To coerce distributors not to buy TPI calsil JM employees told them JM would not sell its products to them if they bought calsil from TPI. For example, in a March 2018 email to Distribution International employees, a JM manager warned,

> You along with your team are aware of the potential dangers and liabilities you may face in selling this imported product .... You and your team are free to promote and sell any products you wish; however, the breadth and terms of our partnership could potentially change with your promotion and distribution of such imported product.

45.    Mr. Hlavenka of Distribution International likewise testified that JM's Hal Shapiro, a former global sales manager, had threatened to shift JM's calsil business in Houston to a competitor of Distribution International if it continued to buy TPS's calsil.

46.    As for JM's threats to 4-State, Mr. Guest recalled a JM sales representative (Chad Meyer) telling him at an October 2018 trade show that "if [4-State] continued to buy Thermal Pipe Shield's, TPS's Calsil, [4-State] would no longer be able to purchase Johns Manville Calsil." Guest testified that Meyer told him that this message "c[ame] from upper management" at JM.

47.    JM pressured other distributors, including Bay Insulation, Specialty Products, General Insulation, and APi Distribution. In a December 2018 email, Bay Insulation employees reported that "[JM is] taking a hard line against selling anyone who is stocking a 'different' brand" and could "make it pretty hard to do business with [it]." And in notes memorializing a January 2019 meeting with Specialty Products, TPS reported that "JM would stop selling calsil to [Specialty Products] in markets that purchased TPSX-12" and that "JM would punish [Specialty Products] by creating longer lead times for ALL JM products if [it] purchased TPSX-12." In an October 2019 email, TPS employees recounted a meeting with General Insulation in which it

declined to fill an end-customer order for TPS's calsil because of JM's pressuring. And in an October 2018 email, JM employees criticized APi Distribution's decision to buy TPS's calsil, noting that "[JM] would not be supporting [APi Distribution] in the future if [it] support[s] TPS."

48.    JM also disparaged the quality of TPS's imported calsil to some distributors. JM's Meyer recalled telling Guest that Chinese calsil "may have contained trace amounts of asbestos." Hlavenka testified that Shapiro told him that Distribution International needed to be "real careful with Chinese calsil because the amount of free silica in [TPS's] product could be a huge issue." And in a July 2018 email exchange, an APi Distribution employee told TPS's president David Shong that an unnamed JM employee and an unnamed Distribution International salesperson both said that TPS's calsil contained asbestos.

## CLASS ALLEGATIONS

### FEDERAL CALSIL INJUNCTIVE CLASS

49.    Plaintiff is a proposed class representative of a Federal Calsil Injunctive Class comprised of United States indirect purchasers in State jurisdictions alleged herein buying JM calsil on or after February 19, 2021 from United States JM distributors. Members of the Class seek injunctive relief from unlawful JM monopolization of the relevant market.

### Federal Rule of Civil Procedure 23(a) Prerequisites

50.    Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)    The number of persons in the Class is so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the need to expedite judicial relief and the Class Representative's lack of knowledge of the identity

and addresses of all members of the Class.

(b)     There are numerous questions of law and fact arising from the pattern of monopolization which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether JM is estopped from relitigating its monopolization; (2) whether it has market power in the relevant market; (3) whether it has monopolized the relevant market; (4) whether this conduct, taken as a whole, threatens future monopoly pricing; and (5) the nature and extent of the injunctive relief available to the members of the Class.

(c)     The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representative and the members of the Class are similarly or identically harmed by the same systematic and pervasive monopolization and resulting supra-competitive pricing.

(d)     The Class Representative and its counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representative and the members of the Class that would make class certification inappropriate. *See* ¶¶ 15-22 *supra*. Counsel for the Class will vigorously assert the claims of the Class Representative and the other members of the Class.

## Federal Rule of Civil Procedure 23(b)(2) Prerequisites

51.     The prosecution of the claims of the Class pursuant to Rule 23(b)(2) is appropriate because JM has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## MONOPOLIZATION INJUNCTIVE CAUSE OF ACTION

### Monopolization in Violation of the Sherman Act
### (15 U.S § 2)

52.    Plaintiff incorporates the allegations in paragraphs above by reference.

53.    JM has monopolized the relevant market for the sale of calsil in the United States and cannot relitigate its monopolization under the law of collateral estoppel.

54.    JM has market power in this relevant market and has maintained that power over the last several years by anticompetitively excluding competition from its only competitor, TPS.

55.    Competition in the relevant market has been harmed and the JM calsil prices paid by Class purchasers are higher than competitive levels.

56.    As a consequence, members of the Federal Calsil Injunctive Class are threatened by antitrust price injury materially caused by the JM monopoly maintenance and seek relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

### SUPPLEMENTAL JURISDICTION

### STATE CALSIL INDIRECT PURCHASER DAMAGE CLASS

57.    Plaintiff incorporates paragraphs above by reference.

58.    The monopolization claim is prosecuted as well by a State Calsil Indirect Purchaser Damage Class under Fed. R. Civ. P. 23(a) and 23(b)(3) encompassing:

> All United States indirect purchasers residing in the Indirect Purchaser Jurisdictions alleged herein buying JM calsil from JM United States distributors, wholesalers, or other resellers on or after February 19, 2021. The Class is organized into sub-classes according to the Indirect Purchaser Jurisdiction alleged.

### Rule 23(a) Prerequisites

59.    Prosecution of the claims of the Class and its Sub-Classes as a class action is

15

appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class and is in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representative's lack of knowledge of the identity and addresses of all members of the Class.

(b)     There are numerous questions of law and fact arising from the pattern of monopolization which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether JM is estopped from relitigating its monopolization under the law of collateral estoppel; (2) whether it has engaged in monopolization in the Indirect Purchaser Jurisdictions; and (3) whether this conduct, taken as a whole, has materially caused antitrust price injury to be inflicted indirectly on members of the Class.

60.     The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representative and the members of the Class are similarly or identically harmed by the same systematic and pervasive monopolization.

61.     The Class Representative and its counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of each Class Representative and the members of the Class that would make class certification inappropriate. *See* ¶¶ 15-22 *supra.* Counsel for the Class will vigorously assert the claims of the

Class Representative and the other members of the Class.

### Rule 23(b)(3) Prerequisites

62.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)     Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

### CLASSWIDE ANTITRUST PRICE INJURY

63.     JM's monopolization has materially caused classwide antitrust price injury to members of the State Calsil Indirect Purchaser Damage Class.

64.     Such supra-competitive pricing is the type of concrete injury the State monopolization laws are plainly intended to prevent. Plaintiff is motivated to enforce all these monopolization laws because it has the natural economic self-interest in paying competitive rather than supra-competitive prices. *Supra* ¶¶ 15-21.

### COUNT I

### Alabama

65.     JM's monopolization also violates the Alabama Code. The monopolization has had the following effects: (1) competition for the sale of calsil to Alabama indirect purchasers has been monopolized throughout Alabama; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Alabama; (3) Alabama indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid

above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Alabama commerce. As a direct and proximate result of JM's unlawful conduct, Alabama indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Alabama indirect purchasers seek all forms of relief available under Alabama Code § 6-5-60, *et seq*.

## COUNT II

### Arizona

66.    JM's monopolization also violates the Arizona Revised Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to Arizonia indirect purchasers has been monopolized throughout Arizonia; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Arizonia; (3) Arizonia indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Arizonia commerce. As a direct and proximate result of JM's unlawful conduct, Arizonia indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Arizonia indirect purchasers seek all forms of relief available under Arizona Revised Statutes, § 44-1401, *et seq*.

## COUNT III

### California

67.     JM's monopolization also violates the California Business and Professions Code § 16700 *et seq*. The monopolization has had the following effects: (1) competition for the sale of calsil to California indirect purchasers has been monopolized throughout California; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout California; (3) California indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected California commerce. As a direct and proximate result of JM's unlawful conduct, California indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, California indirect purchasers seek all forms of relief available under California Business and Professions Code § 16720. As a result of Defendant's violation of § 16720, California indirect purchasers seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

## COUNT IV

### Colorado

68.     JM's monopolization also violates the Colorado monopolization law. The monopolization has had the following effects: (1) competition for the sale of  calsil to Colorado indirect purchasers has been monopolized throughout Colorado; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Colorado; (3) Colorado indirect

purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Colorado commerce. As a direct and proximate result of JM's unlawful conduct, Colorado indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Colorado indirect purchasers seek all forms of relief available under Colorado State Antitrust Act of 2023 as codified.

## COUNT V

### District of Columbia

69.     JM's monopolization also violates the District of Columbia Code. The monopolization has had the following effects: (1) competition for the sale of  calsil to District of Columbia indirect purchasers has been monopolized throughout the District of Columbia; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout the District of Columbia; (3) District of Columbia indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected District of Columbia commerce. As a direct and proximate result of JM's unlawful conduct, District of Columbia indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, District of Columbia indirect purchasers seek all forms of relief available under District of Columbia Code Annotated § 28-

4501, *et seq*.

## COUNT VI

### Iowa

70.    JM's monopolization also violates the Iowa Code. The monopolization has had the following effects: (1) competition for the sale of calsil to Iowa indirect purchasers has been monopolized throughout Iowa; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Iowa; (3) Iowa indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Iowa commerce. As a direct and proximate result of JM's unlawful conduct, Iowa indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Iowa indirect purchasers seek all forms of relief available under Iowa Code § 553.1, *et seq*.

## COUNT VII

### Kansas

71.    JM's monopolization also violates Kansas Statutes Annotated. The monopolization has had the following effects: (1) competition for the sale of  calsil to Kansas indirect purchasers has been monopolized throughout Kansas; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Kansas; (3) Kansas indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers,

and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Kansas commerce. As a direct and proximate result of JM's unlawful conduct, Kansas indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Kansas indirect purchasers seek all forms of relief available under Kansas Statutes Annotated, § 50-101, *et seq*.

## COUNT VIII

### Maine

72.     JM's monopolization also violates Maine Revised Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to indirect purchasers has been monopolized throughout Maine; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Maine; (3) Maine indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Maine commerce. As a direct and proximate result of JM's unlawful conduct, Maine indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Maine indirect purchasers seek all forms of relief available under Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

## COUNT IX

### Michigan

73.     JM's monopolization also violates the Michigan Compiled Laws Annotated. The monopolization has had the following effects: (1) competition for the sale of calsil to Michigan

indirect purchasers has been monopolized throughout Michigan; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Michigan; (3) Michigan indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Michigan commerce. As a direct and proximate result of JM's unlawful conduct, Michigan indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Michigan indirect purchasers seek all forms of relief available under Michigan Compiled Laws Annotated § 445.771, *et seq*.

## COUNT X

### Minnesota

74.    JM's monopolization also violates Minnesota Annotated Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to Minnesota indirect purchasers has been monopolized throughout Minnesota; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Minnesota; (3) Minnesota indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Minnesota commerce. As a direct and proximate result of JM's unlawful conduct, Minnesota indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Minnesota

indirect purchasers seek all forms of relief available under Minnesota Annotated Statutes § 325D.49, *et seq.*

## COUNT XI

### Mississippi

75.     JM's monopolization also violates Mississippi Code Annotated. The monopolization has had the following effects: (1) competition for the sale of calsil to Mississippi indirect purchasers has been monopolized throughout Mississippi; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Mississippi; (3) Mississippi indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Mississippi commerce. As a direct and proximate result of JM's unlawful conduct, Mississippi indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Mississippi indirect purchasers seek all forms of relief available under Mississippi Code Annotated § 75-21-1, *et seq.*

## COUNT XII

### Nebraska

76.     JM's monopolization also violates Nebraska Revised Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to Nebraska indirect purchasers has been monopolized throughout Nebraska; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Nebraska; (3) Nebraska indirect purchasers have been

deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Nebraska commerce. As a direct and proximate result of JM's unlawful conduct, Nebraska indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Nebraska indirect purchasers seek all forms of relief available under Nebraska Revised Statutes § 59-801, *et seq*.

## COUNT XIII

### Nevada

77.    JM's monopolization also violates Nevada Revised Statutes Annotated. The monopolization has had the following effects: (1) competition for the sale of  calsil to Nevada indirect purchasers has been monopolized throughout Nevada; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Nevada; (3) Nevada indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Nevada commerce. As a direct and proximate result of JM's unlawful conduct, Nevada indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Nevada indirect purchasers seek all forms of relief available under Nevada Revised Statutes Annotated § 598A.010, *et seq*.

## COUNT XIV

### New Hampshire

78.     JM's monopolization also violates New Hampshire Revised Statutes. The monopolization has had the following effects: (1) competition for the sale of  calsil to New Hampshire indirect purchasers has been monopolized throughout New Hampshire; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout New Hampshire; (3) New Hampshire indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected New Hampshire commerce. As a direct and proximate result of JM's unlawful conduct, New Hampshire indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, New Hampshire indirect purchasers seek all forms of relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

## COUNT XV

### New Mexico

79.     JM's monopolization also violates New Mexico Statutes Annotated. The monopolization has had the following effects: (1) competition for the sale of  calsil to New Mexico indirect purchasers has been monopolized throughout New Mexico; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout New Mexico; (3) New Mexico indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct

26

purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected New Mexico commerce. As a direct and proximate result of JM's unlawful conduct, New Mexico indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, New Mexico indirect purchasers seek all forms of relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

## COUNT XVI

### New York

80.     JM's monopolization also violates New York's Donnelly Act. The monopolization has had the following effects: (1) competition for the sale of calsil to New York indirect purchasers has been monopolized throughout New York; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout New York; (3) New York indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected New York commerce. As a direct and proximate result of JM's unlawful conduct, New York indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, New York indirect purchasers seek all forms of relief available under New York's Donnelly Act, New York General Business Law § 340, *et seq*.

## COUNT XVII

### North Carolina

81.    JM's monopolization also violates North Carolina General Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to North Carolina indirect purchasers has been monopolized throughout North Carolina; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout North Carolina; (3) North Carolina indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected North Carolina commerce. As a direct and proximate result of JM's unlawful conduct, North Carolina indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, North Carolina indirect purchasers seek all forms of relief available under North Carolina General Statutes § 75-1, *et seq*.

## COUNT XVIII

### North Dakota

82.    JM's monopolization also violates North Dakota Century Code. The monopolization has had the following effects: (1) competition for the sale of calsil to North Dakota indirect purchasers has been monopolized throughout North Dakota; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout North Dakota; (3) North Dakota indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass

on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected North Dakota commerce. As a direct and proximate result of JM's unlawful conduct, North Dakota indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, North Dakota indirect purchasers seek all forms of relief available under North Dakota Century Code § 51-08.101, *et seq*.

## COUNT XIX

### Oregon

83.    JM's monopolization also violates Oregon Revised Statutes. The monopolization has had the following effects: (1) competition for the sale of  calsil to Oregon indirect purchasers has been monopolized throughout Oregon; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Oregon; (3) Oregon indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Oregon commerce. As a direct and proximate result of JM's unlawful conduct, Oregon indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Oregon indirect purchasers seek all forms of relief available under Oregon Revised Statutes § 646.705, *et seq*.

## COUNT XX

### Rhode Island

84.    JM's monopolization also violates the Rhode Island Antitrust Act. The

29

monopolization has had the following effects: (1) competition for the sale of calsil to Rhode Island indirect purchasers has been monopolized throughout Rhode Island; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Rhode Island; (3) Rhode Island indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Rhode Island commerce. As a direct and proximate result of JM's unlawful conduct, Rhode Island indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Rhode Island indirect purchasers seek all forms of relief available under Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*.

**COUNT XXI**

**South Dakota**

85.     JM's monopolization also violates South Dakota Codified Law. The monopolization has had the following effects: (1) competition for the sale of calsil to South Dakota indirect purchasers has been monopolized throughout South Dakota; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout South Dakota; (3) South Dakota indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected South Dakota commerce. As a direct and proximate result of JM's unlawful conduct, South Dakota

indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, South Dakota indirect purchasers seek all forms of relief available under South Dakota Codified Laws § 37-1-3.1, *et seq*.

## COUNT XXII

### Tennessee

86.     JM's monopolization also violates Tennessee Code Annotated. The monopolization has had the following effects: (1) competition for the sale of calsil to Tennessee indirect purchasers has been monopolized throughout Tennessee; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Tennessee; (3) Tennessee indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Tennessee commerce. As a direct and proximate result of JM's unlawful conduct, Tennessee indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Tennessee indirect purchasers seek all forms of relief available under Tennessee Code Annotated § 47-25-101, *et seq*.

## COUNT XXIII

### Utah

87.     JM's monopolization also violates Utah Code Annotated. The monopolization has had the following effects: (1) competition for the sale of  calsil to Utah indirect purchasers has been monopolized throughout Utah; (2) JM prices charged to direct purchasers have been at above-

competitive levels throughout Utah; (3) Utah indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Utah commerce. As a direct and proximate result of JM's unlawful conduct, Utah indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Utah indirect purchasers seek all forms of relief available under Utah Code Annotated § 76-10-3101, *et seq*.

## COUNT XXIV

### Vermont

88.    JM's monopolization also violates Vermont Statutes Annotated. The monopolization has had the following effects: (1) competition for the sale of calsil to Vermont indirect purchasers has been monopolized throughout Alabama; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Vermont; (3) Vermont indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Vermont commerce. As a direct and proximate result of JM's unlawful conduct, Vermont indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Vermont indirect purchasers seek all forms of relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

## COUNT XXV

### West Virginia

89.    JM's monopolization also violates West Virginia Code. The monopolization has had the following effects: (1) competition for the sale of calsil to West Virgina indirect purchasers has been monopolized throughout West Virgina; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout West Virgina; (3) West Virgina indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected West Virgina commerce. As a direct and proximate result of JM's unlawful conduct, West Virgina indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, West Virgina indirect purchasers seek all forms of relief available under West Virginia Code § 47-18-1, *et seq*.

## COUNT XXVI

### Wisconsin

90.    JM's monopolization also violates Wisconsin Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to Wisconsin indirect purchasers has been monopolized throughout Wisconsin; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Wisconsin; (3) Wisconsin indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors,

wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Wisconsin commerce. As a direct and proximate result of JM's unlawful conduct, Wisconsin indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Wisconsin indirect purchasers seek all forms of relief available under Wisconsin Statutes § 133.01, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and members of the proposed Federal Calsil Injunctive Class and proposed State Calsil Indirect Purchaser Damage Class respectfully request that this Court grant the following relief in light of JM's unlawful monopolization.

### Federal Calsil Injunctive Class

A.    Declare that JM's conduct violates Sherman Act § 2 allowing injunctive relief for the Federal Calsil Injunctive Class permanently enjoining JM from continuing its unlawful actions;

B.    Award reasonable attorneys' fees and costs as allowed by law; and

C.    Grant such other and further relief as the Court deems just and equitable.

### State Calsil Indirect Purchaser Class

A.    Declare that JM conduct violates the State indirect purchaser statutes as alleged allowing treble or other damage relief to the State Calsil Indirect Purchaser Damage Class;

B.    On behalf of the Class as defined, permanently enjoin JM from continuing its unlawful actions;

C.    Award reasonable attorneys' fees and costs as allowed by law;

34

D.    Award pre-judgment and post-judgment interest at the highest rate allowed by law;

and

E.    Grant such other and further relief as the Court deems just and equitable.

**JURY DEMAND AS TO DAMAGE CLAIMS**

Plaintiff demands a trial by jury of the claims of the damage class.

February 19, 2025                                  Respectfully submitted,

*/s/ R. Stephen Berry*
R. Stephen Berry
**Berry Law PLLC**
1100 Connecticut Avenue, NW
Suite 645
Washington, DC 20036
Telephone: (202) 296-1212
sberry@berrylawpllc.com
***Admitted February 6, 2025***

*Attorneys for Plaintiff*