**ATTACHMENT**

**to**

**Notice of Filing First Amended
Complaint as of Right**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1-25-cv-00534-NRN**

**MIDWEST INSULATION SERVICES INC.**

      **Plaintiff on Behalf of Itself
      And Those Similarly Situated**

          **v.**

**JOHNS MANVILLE CORPORATION,**

      **Defendant.**

---

## FIRST AMENDED CLASS INJUNCTIVE AND DAMAGE COMPLAINT

---

Midwest Insulation Services Inc. ("Plaintiff") brings this action on behalf of itself and similarly-situated United States purchasers of calsil thermal pipe insulation sold by Johns Manville Corporation ("JM") through its United States distributors. It seeks class injunctive relief under federal monopolization law and the law of estoppel for indirect calsil purchasers, as well as damage relief for an indirect purchaser damage class pursuant to State indirect-purchaser, monopolization law and the law of estoppel. It alleges as follows.

### PRIOR PROCEEDING IN THIS COURT GIVING RISE TO
### ESTOPPEL AS TO JM MONOPOLIZATION

1.      In the federal matter *Chase Manufacturing, Inc. v. Johns Manville Corp.* No. 19-cv-00872 -MEH (D. Colo.), the jury found that JM has monopolized an antitrust calsil relevant market under Sherman Act, 15 U.S.C. § 2. Ex. A hereto. The market encompasses the sale in the United States of calsil thermal pipe insulation used by industrial facilities, including power plants

and oil refineries, to insulate pipes transporting materials at temperatures up to 1200 degrees Fahrenheit. On May 14, 2024 the District Court entered a $21 million Final Judgment awarding treble lost profit damages to plaintiff Chase Manufacturing, Inc. (doing business as Thermal Pipe Shields, Inc.) ("TPS"), a JM competitor. Ex. B hereto. The judgment was subsequently adjusted by the Court to $18.45 million. Ex. C hereto.

2. The *Chase Manufacturing* judgment gives rise to collateral estoppel as to the monopolization violation for the benefit of the proposed federal injunctive class alleged herein, and the indirect purchaser damage class alleged herein under State monopolization law. As to the latter, Plaintiff as proposed class representative will show this Court the antitrust price injury and damages materially caused to members of the class by the established JM monopolization. Under the law of collateral estoppel, JM is barred from relitigating that it has monopolized the United States calsil relevant market.

## THE JM MONOPOLIZATION

3. In the alternative, Plaintiff will show the Court as follows. Industrial facilities transitioned away from asbestosis in the 1970s to safer insulation alternatives, including calsil. Calsil is "hydrous calcium silicate" that can be form-fitted for diverse sizes and shapes of industrial equipment, such as pipes and tanks. It is heat-resistant, durable, noncombustible, and anticorrosive.

4. JM is the dominant purveyor of this calsil thermal pipe insulation in the United States with a 97% market share in the calsil relevant market. JM is also the exclusive manufacturer of calsil in the United States.

5. Until 2018, JM was not only the sole United States calsil manufacturer but also the exclusive domestic calsil supplier. It sells calsil to JM thermal-pipe-insulation distributors in the

United States including those in Nebraska. In turn, these United States JM distributors sell calsil to industrial users and insulation contractors ("indirect purchasers") based on project specifications.

6.      In March 2018, TPS entered the United States calsil market with a competing product. As did JM's calsil, TPS's complied with ASTM standards, withstood temperatures up to 1200 degrees Fahrenheit, and allowed for formfitting for various industrial uses.

7.      TPS's calsil came with other advantages. For one, TPS priced its calsil 20% to 25% less than JM priced its calsil. For another, because TPS used a different manufacturing process than JM, TPS's calsil was stronger and more flexible.

8.      Recognizing a competitive threat from an arguably superior, lower priced product JM acted to maintain unlawfully its calsil monopoly in violation of the Sherman Act, 15 U.S.C. § 2 and the State monopolization laws as alleged herein.

## JURISDICTION AND VENUE

9.      Injunctive relief from ongoing monopolization is sought pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. Pursuant to the indirect-purchaser, monopolization law of the States as alleged herein, Plaintiff also seeks class damage relief pursuant to this Court's supplemental jurisdiction, 28 U.S.C. § 1367.

10.      This Court has subject matter jurisdiction over the injunction and damage claims pursuant to 28 U.S.C. § 1331 and Section 16 of the Clayton Act, 15 U.S.C. § 26 and its supplemental jurisdiction, 28 U.S.C. § 1367.

11.      Pursuant to the Class Action Fairness Act, this Court also has original jurisdiction over the proposed State indirect-purchaser damage class pursuant to 28 U.S.C. § 1332(a)(2)

because the monopoly price overcharge injury in controversy exceeds the sum of $5,000,000 exclusive of interest and most members of the proposed class of State indirect-purchasers are citizens of States other than Colorado, while JM is a citizen of Colorado. Pursuant to 28 U.S.C. § 1332(a)(3) this Court may not decline jurisdiction because greater than one-third of the members of the proposed State indirect-purchaser class in the aggregate are not citizens of Colorado. Pursuant to 28 U.S.C. § 1332(a)(4)(A-B) this Court may also not decline jurisdiction because (a) greater than two-thirds of the members of the proposed State indirect-purchaser class in the aggregate are not citizens of Colorado, while JM is a citizen of Colorado; (b) the principal monopoly overcharge price antitrust injuries alleged occur in States outside Colorado; (c) during a three-year period prior to the filing of this complaint no State indirect-purchaser class has been alleged seeking the same monopoly price injury against JM; and (d) two-thirds or more of the members of the proposed State indirect-purchaser class in the aggregate are not citizens of Colorado.

12.     This Court has personal jurisdiction over the Defendant because it resides in this District; transacts business in this District; and commits overt acts in furtherance of unlawful conduct in this District.

13.     Venue is proper in this District under 28 U.S.C. § 1391 because the Defendant resides, transacts business, has been found, and has agents in this District; and a substantial portion of the affected interstate trade and commerce at issue has been carried out in this District. In addition, Plaintiff as proposed class representative seeks remedy in part for Colorado indirect purchasers resident in this District

## PARTIES

14.     Plaintiff Midwest Insulation Services Inc. is an indirect purchaser of JM calsil resident in Omaha, Nebraska which has been purchasing substantial amounts of JM calsil from JM distributors over the last four years. As a proposed class representative, it seeks damage remedy under the indirect-purchaser, monopolization law of Nebraska, as well as under other State monopolization laws alleged herein. It also seeks federal injunctive relief.

15.     Defendant Johns Manville Corporation is organized under the laws of Delaware, with its head office located in Denver, Colorado. It is a wholly-owned subsidiary of Berkshire Hathaway, Inc. JM manufactures and sells construction products, including mechanical insulation products such as calsil.

## STANDING AND CLASS ADEQUACY OF
## REPRESENTATION

16.     Over many years to the present, JM has continued to exclude calsil competition in the relevant market. As a consequence, its monopoly prices charged for calsil to its distributors are passed on all or in part to members of the State indirect purchaser class purchasing from these JM distributors. These passed-on monopoly prices are substantially above competitive levels. The Plaintiff as proposed class representative, and other members of the damage class of indirect purchasers of JM calsil alleged, all suffer antitrust price injury materially caused by JM's monopolization.

17.     In *Chase Manufacturing* the judgment only awarded TPS lost-profit damages trebled. The extent of monopoly overcharge antitrust price injury and damages to be shown herein inflicted on the indirect purchase damage class were not at issue, and the overcharge remedy sought here does not overlap with the TPS remedy in any way.

18.     This antitrust price injury to be shown is of the type the federal and State antitrust laws are plainly intended to prevent and flows from the exclusionary conduct making JM's acts unlawful.

19.     JM's misconduct has materially caused passed-on antitrust price injury to Plaintiff as proposed class representative. Plaintiff is motivated to enforce the State monopolization law of Nebraska, and the monopolization laws of the other States alleged herein, because it has the natural economic self-interest in paying competitive, rather than monopoly, supra-competitive prices.  As a consequence, it has standing to assert such claims for indirect-purchaser class members in other States as alleged, as well as its own State.

20.      Any differences among the monopolization laws of all States alleged do not defeat the standing of the Plaintiff as proposed class representative to assert similar monopolization remedy under all the State antitrust laws alleged.

21.     The Nebraska monopolization claim of the Plaintiff as proposed class representative closely parallels those claims of other State class members in other jurisdictions because, assuming a proper damage class is certified, success of its claim under Nebraska's monopolization law will dictate success under other State monopolization laws alleged because all these State laws are typically construed consistent with a federal monopolization claim under the Sherman Act, 15 U.S.C. § 2.

22.     Under all State monopolization laws alleged, all class members have been forced to pay supra-competitive, monopoly pricing due to the JM monopolization of the calsil relevant market and have a substantial and shared interest in proving that the passed-on monopoly pricing is the material result of unlawful JM monopolization redressable by an award of antitrust damages.

23.     The judgments for class members entered under the monopolization laws of States, other than the Plaintiff's Nebraska judgment, are materially the same as the Nebraska judgment and have no relevant bearing on the personal stake of the Plaintiff in litigating the case to secure all class judgments.

**RELEVANT MARKET**

24.     The relevant calsil product market encompasses the sale of calsil insulation pipe and block products. "Calsil" refers to hydrous calcium silicate thermal insulation that is factory formed into flat blocks or in curved sections designed to encapsulate pipes, equipment or tanks. It is manufactured in accordance with ASTM C533 Type I. ASTM International is an international standards organization publishing material specifications widely used by engineers to qualify generic product types.

25.     Calsil replaced asbestos as the industry standard for mechanical insulation in mid-high temperature applications starting around 1973. The applications include piping, tanks, and other equipment that operate at temperatures up to 1200° Fahrenheit within large industrial facilities, such as oil refineries, chemical and power generation plants and pulp and paper mills.

26.     Because of its unique physical properties, calsil is extremely heat resistant and provides very high compressive strength to resist damage and physical abuse much better than other products. Its extreme durability provides long service life by preventing crushing due to on-site foot traffic and abuse; it is inherently non-combustible; it generates no smoke when exposed to flame, which provides passive fire protection; contains integral corrosion-inhibiting chemistry; and it offers low thermal conductivity to prevent heat loss and reduce

the surface temperature of insulated surfaces, characteristics that protect workers from burn injuries in the plant.

27.     These special attributes of calsil make it the essential insulation for mid- to high-temperature piping and equipment because there are no reasonably interchangeable substitutes that provide the same combination of physical properties with the accompanying benefits that meet the requirements of ASTM C533 Type I: Standard Specification.

28.     Based on performance characteristics and life cycle cost, industrial project engineers specify calsil because there are no reasonably interchangeable substitutes and calsil is a distinct product market.

29.     The demand for calsil is national and it is sold to JM distributors at their respective locations throughout the United States. As a result, the relevant geographic market for calsil is the United States.

30.     At one point there were eight United States calsil factories owned by competing manufacturers. But over time, through plant closures, and every other manufacturer exiting the market, JM now owns and operates the only two remaining calsil factories in North America.

31.     Currently, JM has a market share of 97% of the United States relevant calsil market protected by substantial barriers to entry.

32.     To be used and accepted by customers, calsil must meet North American market requirements, meaning it must meet or exceed all physical properties in accordance with ASTM C533 Type I specifications. This standard creates a significant barrier to entry. There are only three factories in the entire world that can produce calsil that not only meets all

applicable ASTM C533 Type I requirements, but also produce with North American sizing norms for both length and dimensional tolerances in accordance with ASTM C585: Standard Practice for Inner and Outer Diameters of Thermal Insulation for Nominal Sizes of Pipe and Tubing. Two of those factories are in the United States and both are owned by JM. The third is in Shanghai, China, which sells its calsil in North America exclusively to TPI.

## EXCLUSIONARY CONDUCT

33. JM has excluded competition to charge monopoly calsil pricing as a result of its control of calsil distributors and its ability to impede the growth of its only competitor, TPS. Robert Hlavenka, senior vice president of strategic sourcing for the large distributor Distribution International, Inc. has testified that his distributor continued to buy 99% of its calsil from JM after TPS entered the market. This was so despite his belief "that the TPS product is a superior product ... t[o] the JM product." Employees from another distributor, Bay Insulation, have testified that JM could "simply raise the price to put [calsil] out of reach." And both Hlavenka and Joseph Guest of distributor 4-State Supply, Inc. have testified their companies could not stay in business without access to JM's products. Hlavenka put it this way:

Q. Does [Distribution International] feel that it could decide not to do business with JM across the board?

A. I don't think that we can do without JM.

Q. Why is that?

A. Because we have a lot of markets that we're supplying their product, and we -- we can't get the other suppliers to support us in those markets.

34. JM has maintained its market power in the domestic calsil market for more than three years after market entry of its only competitor TPS. JM makes much higher gross margins

on calsil compared to its other thermal-insulation products (in which it faces competitive markets). This is the same for JM's United States calsil sales as contrasted to its international calsil sales in more competitive markets.

35.     JM Has sufficient economic power over its distributors and other direct customers in the United States to impede TPS's market growth. Distributors have continued to purchase JM's calsil despite earning significantly higher profits on calsil purchased from TPS.

36.     Until 2018 JM was not only the sole United States calsil manufacturer, but also the exclusive domestic calsil supplier. It sells calsil to its distributors in the United States.  In turn these distributors resell calsil to class indirect purchasers such as insulation contractors such as Plaintiff based on project specifications.

37.     In March 2018 TPS entered the United States calsil market with a competing product under the brand name TPSX-12. As does JM's calsil, TPS's complied with ASTM standards, withstood temperatures up to 1200 degrees Fahrenheit, and allowed for formfitting for various industrial uses.

38.     Further TPS's calsil came with substantial competitive advantages. For one, TPS priced its calsil 20% to 25% less than JM priced its Thermo-1200. For another, because TPS used a different manufacturing process than JM, TPS's calsil was stronger and more flexible.

39.     Distributors started purchasing TPS product and some believed TPS calsil was superior to the JM product. Bay Insulation Supply Inc., one of the five largest JM national distributors of calsil, agreed to serve as TPS's exclusive calsil supplier for two California regions. Two smaller distributors, APi Distribution and GLT Fabricators, reached similar exclusivity agreements with TPS for small regions elsewhere in the United States. Between 2018 and August

2021, TPS sold more than $2.3 million in calsil to nine distributors, including some to each of the five largest distributors. Twenty-two other distributors kept buying calsil exclusively from JM.

40.     JM immediately recognized the threat TPS's less expensive and arguably superior calsil posed to its complete monopoly. It responded to TPS's market entry with two anti-competitive gambits aimed at maintaining its monopoly by coercing distributors not to buy TPS's calsil and by disparaging the quality of TPS's calsil to distributors by falsely raising concerns about asbestos and silica particles.

### Coercing Distributors to Exclude Competition

41.     Both JM and TPS sell mechanical insulation products, including calsil, almost exclusively through distributors. There are five major mechanical insulation distributors that dominate nationwide. These five distributors each operate in at least 28, and in some cases as many as 66, different locations throughout the country. Between them, the five largest distributors operate in 218 locations nationwide. In many areas, there are no alternative sources of the mechanical insulation products that they distribute.

42.     Each of these five JM distributors purchases calsil and other mechanical insulation products nationally, and together these five distributors account for approximately 85% of mechanical insulation sales. The five largest distributors are: Distribution International, Inc. (DI), headquartered in Houston, Texas and which purchases a range of mechanical insulation products in 66 locations in 29 states nationwide; Specialty Products & Insulation Co. (SPI), headquartered in Lancaster, Pennsylvania, purchases a range of mechanical insulation products in 49 locations in 25 states nationwide; General Insulation Company, Inc. (GI), headquartered in Medford, Massachusetts and which purchases a range of mechanical

insulation products in 46 locations in 23 states nationwide; MacArthur Co., headquartered in St. Paul, Minnesota, purchases a range of mechanical insulation products in 29 locations in 12 states nationwide; and Bay Insulation Supply Inc. (Bay Insulation), headquartered in Green Bay, Wisconsin, purchases a range of mechanical insulation products in 28 locations in 14 states nationwide.

43.     An internal JM email, sent days after TPS's market entry, advised JM's sales force: "[i]f we need to bring the sword, then '[if] you [the distributors] choose to buy material from Thermal Pipe Shields, then that will significantly alter your company's relationship with Johns Manville as a mechanical insulation partner.'" In another March 2018 internal email, a JM manager coached his sales team to stress TPS's "foreign manufacturing," JM's superior "support after the sale," Thermo-1200's better "water-resistance," and TPSX-12's lack of "testing."

44.     JM closely monitored TPS's calsil sales to distributors and worried about the competition. For instance, in a June 2018 internal email—subject line: "MacArthur buying from TPS???"—a JM manager lamented the large distributor's possibly having bought calsil from TPS. And in a November 2018 internal presentation, JM employees conceded that Thermo-1200 "h[e]ld no competitive quality or price advantage" over TPSX-12. They also posed a market-share hypothetical envisioning that JM could lose significant market share against TPS's less expensive and arguably superior calsil.

45.     To coerce distributors not to buy TPI calsil JM employees told them JM would not sell its products to them if they bought calsil from TPI. For example, in a March 2018 email to Distribution International employees, a JM manager warned,

> You along with your team are aware of the potential dangers and liabilities you may face in selling this imported product .... You and your team are free to promote and

sell any products you wish; however, the breadth and terms of our partnership could potentially change with your promotion and distribution of such imported product.

46.     Mr. Hlavenka of Distribution International likewise testified that JM's Hal Shapiro, a former global sales manager, had threatened to shift JM's calsil business in Houston to a competitor of Distribution International if it continued to buy TPS's calsil.

47.     As for JM's threats to 4-State, Mr. Guest recalled a JM sales representative (Chad Meyer) telling him at an October 2018 trade show that "if [4-State] continued to buy Thermal Pipe Shield's, TPS's Calsil, [4-State] would no longer be able to purchase Johns Manville Calsil." Guest testified that Meyer told him that this message "c[ame] from upper management" at JM.

48.     JM pressured other distributors, including Bay Insulation, Specialty Products, General Insulation, and APi Distribution. In a December 2018 email, Bay Insulation employees reported that "[JM is] taking a hard line against selling anyone who is stocking a 'different' brand" and could "make it pretty hard to do business with [it]." And in notes memorializing a January 2019 meeting with Specialty Products, TPS reported that "JM would stop selling calsil to [Specialty Products] in markets that purchased TPSX-12" and that "JM would punish [Specialty Products] by creating longer lead times for ALL JM products if [it] purchased TPSX-12." In an October 2019 email, TPS employees recounted a meeting with General Insulation in which it declined to fill an end-customer order for TPS's calsil because of JM's pressuring. And in an October 2018 email, JM employees criticized APi Distribution's decision to buy TPS's calsil, noting that "[JM] would not be supporting [APi Distribution] in the future if [it] support[s] TPS."

49.     JM also disparaged the quality of TPS's imported calsil to some distributors. JM's Meyer recalled telling Guest that Chinese calsil "may have contained trace amounts of asbestos." Hlavenka testified that Shapiro told him that Distribution International needed to be "real careful

with Chinese calsil because the amount of free silica in [TPS's] product could be a huge issue."

And in a July 2018 email exchange, an APi Distribution employee told TPS's president David

Shong that an unnamed JM employee and an unnamed Distribution International salesperson both

said that TPS's calsil contained asbestos.

## CLASS ALLEGATIONS

### FEDERAL CALSIL INJUNCTIVE CLASS

50.    Plaintiff is a proposed class representative of a Federal Calsil Injunctive Class

comprised of United States indirect purchasers in State jurisdictions alleged herein buying JM

calsil on or after February 19, 2021 from United States JM distributors. Members of the Class seek

injunctive relief from unlawful JM monopolization of the relevant market.

### Federal Rule of Civil Procedure 23(a) Prerequisites

51.    Prosecution of the claims of the Class as a class action is appropriate because the

prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)    The number of persons in the Class is so numerous that joinder of all

members of the Class is impracticable. Joinder also is impracticable because of the need to

expedite judicial relief and the Class Representative's lack of knowledge of the identity

and addresses of all members of the Class.

(b)    There are numerous questions of law and fact arising from the pattern of

monopolization which are common to the members of the Class. These include, but are not

limited to, common issues as to (1) whether JM is estopped from relitigating its

monopolization; (2) whether it has market power in the relevant market; (3) whether it has

monopolized the relevant market; (4) whether this conduct, taken as a whole, threatens

future monopoly pricing; and (5) the nature and extent of the injunctive relief available to the members of the Class.

(c)     The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representative and the members of the Class are similarly or identically harmed by the same systematic and pervasive monopolization and resulting supra-competitive pricing.

(d)     The Class Representative and its counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representative and the members of the Class that would make class certification inappropriate. *See* ¶¶ 16-23 *supra*. Counsel for the Class will vigorously assert the claims of the Class Representative and the other members of the Class.

## Federal Rule of Civil Procedure 23(b)(2) Prerequisites

52.     The prosecution of the claims of the Class pursuant to Rule 23(b)(2) is appropriate because JM has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## MONOPOLIZATION INJUNCTIVE CAUSE OF ACTION

### Monopolization in Violation of the Sherman Act
### (15 U.S § 2)

53.     Plaintiff incorporates the allegations in paragraphs above by reference.

54.     JM has monopolized the relevant market for the sale of calsil in the United States and cannot relitigate its monopolization under the law of collateral estoppel.

55.     Upon    information    and    belief,    JM    exclusionary    conduct    maintaining

monopolization continues.

56.     JM has market power in this relevant market and has maintained that power to the present over the last several years by anticompetitively excluding competition.

57.     Competition in the relevant market has been harmed and the JM calsil prices paid by Class purchasers are higher than competitive levels.

58.     As a consequence, members of the Federal Calsil Injunctive Class are threatened by antitrust price injury materially caused by the JM monopoly maintenance and seek relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

**SUPPLEMENTAL JURISDICTION AND JURISDICTION UNDER
THE CLASS ACTION FAIRNESS ACT**

**STATE CALSIL INDIRECT PURCHASER DAMAGE CLASS**

59.     Plaintiff incorporates paragraphs above by reference.

60.     The monopolization claim is prosecuted as well by a State Calsil Indirect Purchaser Damage Class under Fed. R. Civ. P. 23(a) and 23(b)(3) encompassing:

> All United States indirect purchasers residing in the Indirect Purchaser Jurisdictions alleged herein buying JM calsil from JM United States distributors, wholesalers, or other resellers on or after February 19, 2021. The Class is organized into sub-classes according to the Indirect Purchaser Jurisdiction alleged.

**Rule 23(a) Prerequisites**

61.     Prosecution of the claims of the Class and its Sub-Classes as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

        (a)     The number of persons in the Class and is in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is

impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representative's lack of knowledge of the identity and addresses of all members of the Class.

(b)     There are numerous questions of law and fact arising from the pattern of monopolization which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether JM is estopped from relitigating its monopolization under the law of collateral estoppel; (2) whether it has engaged in monopolization in the Indirect Purchaser Jurisdictions; and (3) whether this conduct, taken as a whole, has materially caused antitrust price injury to be inflicted indirectly on members of the Class.

62.     The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representative and the members of the Class are similarly or identically harmed by the same systematic and pervasive monopolization.

63.     The Class Representative and its counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of each Class Representative and the members of the Class that would make class certification inappropriate. *See* ¶¶ 16-23 *supra.* Counsel for the Class will vigorously assert the claims of the Class Representative and the other members of the Class.

### Rule 23(b)(3) Prerequisites

64.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)     Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

## CLASSWIDE ANTITRUST PRICE INJURY

65.     JM's monopolization has materially caused classwide antitrust price injury to members of the State Calsil Indirect Purchaser Damage Class.

66.     Such supra-competitive pricing is the type of concrete injury the State monopolization laws are plainly intended to prevent. Plaintiff is motivated to enforce all these monopolization laws because it has the natural economic self-interest in paying competitive rather than supra-competitive prices. *Supra* ¶¶ 16-23.

## COUNT I

## Alabama

67.     JM's monopolization also violates the Alabama Code. The monopolization has had the following effects: (1) competition for the sale of calsil to Alabama indirect purchasers has been monopolized throughout Alabama; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Alabama; (3) Alabama indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Alabama commerce. As a direct and proximate result of JM's unlawful conduct, Alabama indirect purchasers have been injured in

their business and property and are threatened with further such injury. Accordingly, Alabama indirect purchasers seek all forms of relief available under Alabama Code § 6-5-60, *et seq.*

## COUNT II

### Arizona

68.     JM's monopolization also violates the Arizona Revised Statutes. The monopolization has had the following effects: (1) competition for the sale of  calsil to Arizonia indirect purchasers has been monopolized throughout Arizonia; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Arizonia; (3) Arizonia indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Arizonia commerce. As a direct and proximate result of JM's unlawful conduct, Arizonia indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Arizonia indirect purchasers seek all forms of relief available under Arizona Revised Statutes, § 44-1401, *et seq.*

## COUNT III

### California

69.     JM's monopolization also violates the California Business and Professions Code § 16700 *et seq.* The monopolization has had the following effects: (1) competition for the sale of calsil to California indirect purchasers has been monopolized throughout California; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout California; (3)

California indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected California commerce. As a direct and proximate result of JM's unlawful conduct, California indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, California indirect purchasers seek all forms of relief available under California Business and Professions Code **§** 16720. As a result of Defendant's'violation of § 16720, California indirect purchasers seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

## COUNT IV

### Colorado

70.     JM's monopolization also violates the Colorado monopolization law. The monopolization has had the following effects: (1) competition for the sale of  calsil to Colorado indirect purchasers has been monopolized throughout Colorado; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Colorado; (3) Colorado indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Colorado commerce. As a direct and proximate result of JM's unlawful conduct, Colorado indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Colorado

indirect purchasers seek all forms of relief available under Colorado State Antitrust Act of 2023 as codified.

## COUNT V

### District of Columbia

71.     JM's monopolization also violates the District of Columbia Code. The monopolization has had the following effects: (1) competition for the sale of calsil to District of Columbia indirect purchasers has been monopolized throughout the District of Columbia; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout the District of Columbia; (3) District of Columbia indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected District of Columbia commerce. As a direct and proximate result of JM's unlawful conduct, District of Columbia indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, District of Columbia indirect purchasers seek all forms of relief available under District of Columbia Code Annotated § 28-4501, *et seq*.

## COUNT VI

### Iowa

72.     JM's monopolization also violates the Iowa Code. The monopolization has had the following effects: (1) competition for the sale of calsil to Iowa indirect purchasers has been monopolized throughout Iowa; (2) JM prices charged to direct purchasers have been at above-

competitive levels throughout Iowa; (3) Iowa indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Iowa commerce. As a direct and proximate result of JM's unlawful conduct, Iowa indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Iowa indirect purchasers seek all forms of relief available under Iowa Code § 553.1, *et seq*.

## COUNT VII

### Kansas

73.     JM's monopolization also violates Kansas Statutes Annotated. The monopolization has had the following effects: (1) competition for the sale of  calsil to Kansas indirect purchasers has been monopolized throughout Kansas; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Kansas; (3) Kansas indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Kansas commerce. As a direct and proximate result of JM's unlawful conduct, Kansas indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Kansas indirect purchasers seek all forms of relief available under Kansas Statutes Annotated, § 50-101, *et seq*.

## COUNT VIII

## Maine

74.     JM's monopolization also violates Maine Revised Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to indirect purchasers has been monopolized throughout Maine; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Maine; (3) Maine indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Maine commerce. As a direct and proximate result of JM's unlawful conduct, Maine indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Maine indirect purchasers seek all forms of relief available under Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

## COUNT IX

## Michigan

75.     JM's monopolization also violates the Michigan Compiled Laws Annotated. The monopolization has had the following effects: (1) competition for the sale of calsil to Michigan indirect purchasers has been monopolized throughout Michigan; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Michigan; (3) Michigan indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the

monopolization. JM's illegal conduct has substantially affected Michigan commerce. As a direct and proximate result of JM's unlawful conduct, Michigan indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Michigan indirect purchasers seek all forms of relief available under Michigan Compiled Laws Annotated § 445.771, *et seq*.

## COUNT X

### Minnesota

76.     JM's monopolization also violates Minnesota Annotated Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to Minnesota indirect purchasers has been monopolized throughout Minnesota; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Minnesota; (3) Minnesota indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Minnesota commerce. As a direct and proximate result of JM's unlawful conduct, Minnesota indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Minnesota indirect purchasers seek all forms of relief available under Minnesota Annotated Statutes § 325D.49, *et seq*.

## COUNT XI

### Mississippi

77.     JM's monopolization also violates Mississippi Code Annotated. The

24

monopolization has had the following effects: (1) competition for the sale of calsil to Mississippi indirect purchasers has been monopolized throughout Mississippi; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Mississippi; (3) Mississippi indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Mississippi commerce. As a direct and proximate result of JM's unlawful conduct, Mississippi indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Mississippi indirect purchasers seek all forms of relief available under Mississippi Code Annotated § 75-21-1, *et seq*.

## COUNT XII

### Nebraska

78.      JM's monopolization also violates Nebraska Revised Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to Nebraska indirect purchasers has been monopolized throughout Nebraska; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Nebraska; (3) Nebraska indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Nebraska commerce. As a direct and proximate result of JM's unlawful conduct, Nebraska indirect purchasers have been injured in

their business and property and are threatened with further such injury. Accordingly, Nebraska indirect purchasers seek all forms of relief available under Nebraska Revised Statutes § 59-801, *et seq*.

## COUNT XIII

### Nevada

79.     JM's monopolization also violates Nevada Revised Statutes Annotated. The monopolization has had the following effects: (1) competition for the sale of calsil to Nevada indirect purchasers has been monopolized throughout Nevada; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Nevada; (3) Nevada indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Nevada commerce. As a direct and proximate result of JM's unlawful conduct, Nevada indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Nevada indirect purchasers seek all forms of relief available under Nevada Revised Statutes Annotated § 598A.010, *et seq*.

## COUNT XIV

### New Hampshire

80.     JM's monopolization also violates New Hampshire Revised Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to New Hampshire indirect purchasers has been monopolized throughout New Hampshire; (2) JM prices

charged to direct purchasers have been at above-competitive levels throughout New Hampshire; (3) New Hampshire indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected New Hampshire commerce. As a direct and proximate result of JM's unlawful conduct, New Hampshire indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, New Hampshire indirect purchasers seek all forms of relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

## COUNT XV

## New Mexico

81.     JM's monopolization also violates New Mexico Statutes Annotated. The monopolization has had the following effects: (1) competition for the sale of calsil to New Mexico indirect purchasers has been monopolized throughout New Mexico; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout New Mexico; (3) New Mexico indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected New Mexico commerce. As a direct and proximate result of JM's unlawful conduct, New Mexico indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, New Mexico indirect purchasers seek all forms of relief available under New

Mexico Statutes Annotated § 57-1-1, *et seq*.

## COUNT XVI

### New York

82.     JM's monopolization also violates New York's Donnelly Act. The monopolization has had the following effects: (1) competition for the sale of calsil to New York indirect purchasers has been monopolized throughout New York; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout New York; (3) New York indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected New York commerce. As a direct and proximate result of JM's unlawful conduct, New York indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, New York indirect purchasers seek all forms of relief available under New York's Donnelly Act, New York General Business Law § 340, *et seq*.

## COUNT XVII

### North Carolina

83.     JM's monopolization also violates North Carolina General Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to North Carolina indirect purchasers has been monopolized throughout North Carolina; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout North Carolina; (3) North Carolina indirect purchasers have been deprived of free and open competition; and (4) these

members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected North Carolina commerce. As a direct and proximate result of JM's unlawful conduct, North Carolina indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, North Carolina indirect purchasers seek all forms of relief available under North Carolina General Statutes § 75-1, *et seq*.

## COUNT XVIII

### North Dakota

84.     JM's monopolization also violates North Dakota Century Code. The monopolization has had the following effects: (1) competition for the sale of calsil to North Dakota indirect purchasers has been monopolized throughout North Dakota; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout North Dakota; (3) North Dakota indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected North Dakota commerce. As a direct and proximate result of JM's unlawful conduct, North Dakota indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, North Dakota indirect purchasers seek all forms of relief available under North Dakota Century Code § 51-08.101, *et seq*.

## COUNT XIX

## Oregon

85. JM's monopolization also violates Oregon Revised Statutes. The monopolization has had the following effects: (1) competition for the sale of calsil to Oregon indirect purchasers has been monopolized throughout Oregon; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Oregon; (3) Oregon indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Oregon commerce. As a direct and proximate result of JM's unlawful conduct, Oregon indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Oregon indirect purchasers seek all forms of relief available under Oregon Revised Statutes § 646.705, *et seq*.

## COUNT XX

## Rhode Island

86. JM's monopolization also violates the Rhode Island Antitrust Act. The monopolization has had the following effects: (1) competition for the sale of calsil to Rhode Island indirect purchasers has been monopolized throughout Rhode Island; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Rhode Island; (3) Rhode Island indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct

purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Rhode Island commerce. As a direct and proximate result of JM's unlawful conduct, Rhode Island indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Rhode Island indirect purchasers seek all forms of relief available under Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*.

## COUNT XXI

### South Dakota

87.     JM's monopolization also violates South Dakota Codified Law. The monopolization has had the following effects: (1) competition for the sale of calsil to South Dakota indirect purchasers has been monopolized throughout South Dakota; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout South Dakota; (3) South Dakota indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected South Dakota commerce. As a direct and proximate result of JM's unlawful conduct, South Dakota indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, South Dakota indirect purchasers seek all forms of relief available under South Dakota Codified Laws § 37-1-3.1, *et seq*.

## COUNT XXII

### Tennessee

88.     JM's monopolization also violates Tennessee Code Annotated. The monopolization has had the following effects: (1) competition for the sale of calsil to Tennessee indirect purchasers has been monopolized throughout Tennessee; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Tennessee; (3) Tennessee indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Tennessee commerce. As a direct and proximate result of JM's unlawful conduct, Tennessee indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Tennessee indirect purchasers seek all forms of relief available under Tennessee Code Annotated § 47-25-101, *et seq*.

## COUNT XXIII

### Utah

89.     JM's monopolization also violates Utah Code Annotated. The monopolization has had the following effects: (1) competition for the sale of  calsil to Utah indirect purchasers has been monopolized throughout Utah; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Utah; (3) Utah indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Utah commerce. As a direct and proximate result of JM's

unlawful conduct, Utah indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Utah indirect purchasers seek all forms of relief available under Utah Code Annotated § 76-10-3101, *et seq*.

## COUNT XXIV

### Vermont

90.    JM's monopolization also violates Vermont Statutes Annotated. The monopolization has had the following effects: (1) competition for the sale of calsil to Vermont indirect purchasers has been monopolized throughout Alabama; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Vermont; (3) Vermont indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Vermont commerce. As a direct and proximate result of JM's unlawful conduct, Vermont indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Vermont indirect purchasers seek all forms of relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

## COUNT XXV

### West Virginia

91.    JM's monopolization also violates West Virginia Code. The monopolization has had the following effects: (1) competition for the sale of calsil to West Virgina indirect purchasers has been monopolized throughout West Virgina; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout West Virgina; (3) West Virgina indirect purchasers have

been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected West Virgina commerce. As a direct and proximate result of JM's unlawful conduct, West Virgina indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, West Virgina indirect purchasers seek all forms of relief available under West Virginia Code § 47-18-1, *et seq*.

## COUNT XXVI

### Wisconsin

92.     JM's monopolization also violates Wisconsin Statutes. The monopolization has had the following effects: (1) competition for the sale of  calsil to Wisconsin indirect purchasers has been monopolized throughout Wisconsin; (2) JM prices charged to direct purchasers have been at above-competitive levels throughout Wisconsin; (3) Wisconsin indirect purchasers have been deprived of free and open competition; and (4) these members of the Class have indirectly paid above-competitive prices for JM calsil due to the pass on by direct purchaser distributors, wholesalers, and other resellers of their antitrust price injury materially caused by the monopolization. JM's illegal conduct has substantially affected Wisconsin commerce. As a direct and proximate result of JM's unlawful conduct, Wisconsin indirect purchasers have been injured in their business and property and are threatened with further such injury. Accordingly, Wisconsin indirect purchasers seek all forms of relief available under Wisconsin Statutes § 133.01, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and members of the proposed Federal Calsil Injunctive Class and proposed State Calsil Indirect Purchaser Damage Class respectfully request that this Court grant the following relief in light of JM's unlawful monopolization.

### Federal Calsil Injunctive Class

A.    Declare that JM's conduct violates Sherman Act § 2 allowing injunctive relief for the Federal Calsil Injunctive Class permanently enjoining JM from continuing its unlawful actions;

B.    Award reasonable attorneys' fees and costs as allowed by law; and

C.    Grant such other and further relief as the Court deems just and equitable.

### State Calsil Indirect Purchaser Class

A.    Declare that JM conduct violates the State indirect purchaser statutes as alleged allowing treble or other damage relief to the State Calsil Indirect Purchaser Damage Class;

B.    On behalf of the Class as defined, permanently enjoin JM from continuing its unlawful actions;

C.    Award reasonable attorneys' fees and costs as allowed by law;

D.    Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.    Grant such other and further relief as the Court deems just and equitable.

### JURY DEMAND AS TO DAMAGE CLAIMS

Plaintiff demands a trial by jury of the claims of the damage class.

March 11, 2025                              Respectfully submitted,


                                           */s/ R. Stephen Berry*
                                           R. Stephen Berry
                                           **Berry Law PLLC**
                                           1100 Connecticut Avenue, NW
                                           Suite 645
                                           Washington, DC 20036
                                           Telephone: (202) 296-1212
                                           sberry@berrylawpllc.com
                                           ***Admitted February 6, 2025***

                                           *Attorneys for Plaintiff*

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC. d/b/a THERMAL PIPE SHIELDS,

     Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

     Defendant.

## JURY SPECIAL VERDICT FORM

**You are instructed to answer the following questions. You must apply the law in the instructions that the Court gave you to the facts that were proved by the evidence. You must all agree on your answer to each question, and you must all sign the completed form on the signature lines.**

### ANSWERS

We, the jury, present our answers to questions submitted by the Court, to which we have all agreed:

**NOTE: If you answer any of the below questions "No," then your verdict is for Johns Manville ("JM"), your deliberations are completed, and your foreperson and all other jurors shall sign this Special Verdict Form on the lines provided, without answering any of the remaining questions.**

1. Has Chase Manufacturing, Inc., which does business as Thermal Pipe Shields ("TPS"), proven by a preponderance of the evidence a relevant market for the U.S. sale of calcium silicate ("calsil")?

Yes __X__   No _____

*If you answered "Yes" to Question No. 1, proceed to Question No. 2.*

2. Has TPS proven by a preponderance of the evidence that JM possessed monopoly power in the relevant market you found in Question No. 1?

Yes __X__   No _____

*If you answered "Yes" to Question No. 2, proceed to Question No. 3.*

3. Has TPS proven by a preponderance of the evidence that JM engaged in anticompetitive threats to withhold its products from its customers if such customers did business with TPS?

Yes __X__   No _____

*If you answered "Yes" to Question No. 3, proceed to Question No. 4.*

4. Has TPS proven by a preponderance of the evidence that the anticompetitive threats you found in Question No. 3 substantially foreclosed TPS from the market which you found in Question No. 1 and impeded TPS's growth in that market?

Yes __X__   No _____

*If you answered "Yes" to Question No. 4, proceed to Question No. 5.*

5. Has TPS proven by a preponderance of the evidence that it was injured in its business or property as a result of JM's unlawful monopolization?

Yes __X__   No _____

*If you answered "Yes" to Question No. 5, proceed to Question No. 6.*

2

6.      Has TPS proven by a preponderance of the evidence that the injury you found in

Question No. 5 was the type that the antitrust laws were intended to prevent?

Yes  ✗      No _____

*If you answered "Yes" to Question No. 6, proceed to Question No. 7.*

7.      What is the total amount of TPS's damages to its business or property because of

JM's unlawful monopolization?

$ 6,784,042



3

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC. d/b/a THERMAL PIPE SHIELDS,

     Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

     Defendant.

---

## FINAL JUDGMENT

---

     Pursuant to and in accordance with Fed. R. Civ. P. 58(a) and the orders entered in this case, FINAL JUDGMENT is entered.

     This matter was tried before a jury of eight (8), duly sworn to try the issues herein with Chief United States Magistrate Judge Michael E. Hegarty presiding, and the jury has rendered a verdict. Pursuant to the jury's verdict at ECF 363 and redacted at ECF 362, it is

     ORDERED that final judgment is entered IN FAVOR of PLAINTIFF, Chase Manufacturing, Inc. doing business as Thermal Pipe Shields, and AGAINST DEFENDANT, Johns Manville Corporation, on Plaintiff's monopolization claim in the amount of $20,352,126.00, which is three times the amount of the jury's award of $6,784,042.00, under the Sherman Act, 15 U.S.C. § 15(a). It is further

     ORDERED pursuant to D.C.COLO.LCivR 54.1, Plaintiff, as the prevailing party, shall submit its bill of costs within fourteen days of entry of this Judgment.

Dated at Denver, Colorado, May 14, 2024.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

s/Christopher Thompson
Christopher Thompson
Deputy Clerk

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC., d/b/a THERMAL PIPE SHIELDS,

      Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, Chief United States Magistrate Judge.**

      This case was tried to a jury from April 22 through May 3, 2024. The jury found Defendant Johns Manville Corporation ("Manville") liable for one claim of unlawful monopolization under the Sherman Act, 15 U.S.C. § 2. Manville has filed a Motion for New Trial Under Federal Rule of Civil Procedure 59 ("Motion"), ECF 388, which is fully briefed including supplemental briefs from both Parties, ECFs 401, 408, 424, and 426. For the reasons that follow, I deny the Motion.

## BACKGROUND

      Plaintiff Chase Manufacturing, Inc. ("TPS") initiated this antitrust lawsuit on March 22, 2019, asserting five claims for relief related to Manville's alleged "deliberate, systematic, and illegal attempts to maintain its 98% monopoly in a market for insulation products." ECF 1. In the operative Amended Complaint, TPS asserted three civil antitrust claims against Manville related to TPS's efforts to sell calcium silicate, or Calsil for short: (i) tying and (ii) monopolization under the Sherman Act, and (iii) disparagement under the Lanham Act, 15 U.S.C. § 1125. ECF 30 ¶¶

190–230. Later, TPS voluntarily withdrew its stand-alone claim for disparagement. ECF 203 at 10 n.1.

For its two Sherman Act claims, TPS challenged four types of underlying conduct by Manville: tying sales of Calsil to sales of other insulation materials, exclusive dealing arrangements with distributors, refusal to supply (and threats of refusal to supply) Calsil to distributors if they did business with TPS, and disparagement of TPS and its Calsil. ECF 30 ¶¶ 77–179. I granted summary judgment for Manville on both of TPS's claims. ECF 225. On appeal, the Tenth Circuit affirmed the grant of summary judgment on the tying claim but reversed on the monopolization claim based on anticompetitive threats. ECF 247. In so doing, the Circuit said that as to its Sherman Act Section 2 claim, TPS had waived theories of recovery based on tying, rebates as a form of exclusive dealing, and disparagement. *Id.* at 26 n.19. However, the Circuit expressly stated that evidence of disparagement or threats to tie might be relevant to TPS's viable anticompetitive threats claim. *Id.*

On remand from the Tenth Circuit, TPS's anticompetitive threats claim was tried to a jury. ECFs 369–377 (trial transcripts). The jury found that (1) there was a relevant U.S. market for Calsil; (2) Manville possessed monopoly power in this market; (3) Manville engaged in anticompetitive threats to withhold its products from its customers if they did business with TPS; (4) Manville's anticompetitive threats substantially foreclosed TPS from the Calsil market; (5) TPS was injured by Manville's unlawful monopolization; and (6) TPS suffered the type of injury that the antitrust laws were intended to prevent. ECF 362. The jury awarded $6,784,042.00 in damages, which was mandatorily trebled under the Sherman Act. *Id.* This posttrial Motion ensued.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(a)(1)(A) authorizes a court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Whether to grant a motion for a new trial is committed to the district court's discretion. *See M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009). "A motion for new trial 'is not regarded with favor and should only be granted with great caution.'" *Iowa Pac. Holdings, LLC v. Nat'l R.R. Passenger Corp.*, 853 F. Supp. 2d 1094, 1097 (D. Colo. 2012) (quoting *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991)).

"If 'a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence.'" *M.D. Mark, Inc.*, 565 F.3d at 762 (quoting *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1284 (10th Cir. 1999)). Stated otherwise, the motion should be granted only "if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Iowa Pac. Holdings*, 853 F. Supp. 2d at 1097 (quoting *Minshall v McGraw Hill Broad. Co.*, 323 F.3d 1273, 1279 (10th Cir. 2003)). "When reviewing an allegation that a jury's verdict was not supported by evidence, [I] view the record in the light most favorable to the prevailing party." *Patton v. TIC United Corp.*, 77 F.3d 1235, 1242 (10th Cir. 1996).

Whether "the verdict is against the weight of the evidence presents a question of fact, not law." *Id.* Even so, I may not weigh the evidence, pass on the credibility of the witnesses, or substitute my conclusions for those of the jury. *Iowa Pac. Holdings*, 853 F. Supp. 2d at 1097. "The jury has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." *Snyder v. City of Moab*, 354 F.3d 1179, 1188 (10th Cir.

3

2003) (quoting *United Phosphorus, Ltd. V. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 (10th Cir. 2000) (alterations omitted)).

If a motion for new trial is based on an allegedly improper evidentiary ruling and purported prejudicial error, the movant must show that the evidentiary ruling was "both clearly erroneous and so prejudicial that 'it can be reasonably concluded that with or without such evidence, there would have been a contrary result.'" *Id.* (quoting *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1049 (10th Cir. 1993)). "Neither an error in the admission or exclusion of evidence nor an error in a ruling or order of the court, nor anything done or omitted by the court, can be grounds for granting a new trial unless the error or defect affects the substantial rights of the parties." *Id.* (quoting *Stewart v. S. Kan. & Okla. R.R., Inc.*, 36 F. Supp. 2d 919, 920 (D. Kan. 1999)).

## <u>ANALYSIS</u>

Manville asserts five arguments in support of its Motion. First, Manville argues the damages model TPS provided to the jury was legally deficient as it failed to disaggregate alleged losses due to lawful conduct from losses attributable to allegedly anticompetitive conduct. ECF 388 at 5–7.[1] Due to this failure, Manville contends, the damages award violated Manville's due process rights. *Id.* Second, Manville asserts that a new trial is warranted because the damages calculation TPS presented included an improper adjustment for inflation, which is barred under Section 4(a) of the Clayton Act. *Id.* at 7–8. Third, Manville argues the Court should have required TPS "to prove unlawful *de facto* exclusive dealing rather than 'unlawful' or 'anticompetitive' threats." *Id.* at 9–10. Fourth, Manville claims the jury instructions allowed the jury to find Manville liable for conduct the Tenth Circuit held to be lawful or unchallenged on appeal, namely

---

[1] I cite to the CM/ECF document number and page in the CM/ECF heading at the top of the Parties' briefing rather than to the documents' page numbers at the bottom of each page.

disparagement and tying. *Id.* at 10–13. Finally, Manville argues the Court made at least two erroneous evidentiary rulings that were prejudicial and outcome determinative. *Id.* at 13–17. I address each argument in turn below.

## I.     Whether TPS Failed to Present a Disaggregated Damages Amount

In addition to the instant Motion, Manville filed a Renewed Motion for Judgment as a Matter of Law ("Renewed JMOL") under Federal Rule of Civil Procedure 50(b). ECF 387. The main argument in Manville's Renewed JMOL is that TPS's claim fails as a matter of law, because its damages model was "factually flawed" as it failed to disaggregate losses attributable to lawful or unchallenged conduct—the same argument Manville asserts here. *Compare generally* ECF 387 (the Renewed JMOL) *with* ECF 388 at 5–7.[2] In my Order on Manville's Renewed JMOL, ECF 429, I addressed the argument that TPS did not disaggregate damages. For the reasons stated in that Order, I also reject that argument here.

## II.    Whether TPS Included an Improper Inflation Adjustment in the Damages Calculation It Presented to the Jury

Manville's second argument also centers on TPS's damages model, arguing it improperly included an inflation adjustment. ECF 388 at 7–8. Manville contends that under the Clayton Act, 15 U.S.C. § 15(a), prejudgment interest is excluded (except in circumstances not present here)[3] and an adjustment for inflation is the functional equivalent of prejudgment interest. *Id*. Because TPS presented a damages model with "an improper 'inflation adjustment,'" and the jury awarded

---

[2] Manville also references its Renewed JMOL in the relevant argument section of the instant Motion for New Trial. ECF 388 at 5 ("For the reasons set forth in Johns Manville's Renewed Motion for Judgment as a Matter of Law. . .").

[3] The Clayton Act permits a plaintiff to "recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). It then permits the court to award "simple interest on actual damages" upon motion "if the court finds that the award of such interest for such period is just in the circumstances." *Id.* TPS did not file a motion for prejudgment interest in this case.

a lump sum award, Manville argues there is no way to "disentangle" the improper adjustment from the remainder of the award. *Id.* at 8; *see also* ECF 241 at 4:23–5:20. TPS responds that any inflation adjustment was proper and, regardless, did not prejudice Manville as the jury award was below the estimates proffered by TPS's expert. ECF 401.

The Tenth Circuit has not ruled on the issue as to whether an adjustment for inflation constitutes prejudgment interest. I acknowledge that Manville cites cases (including one from this District) which hold that the difference between prejudgment interest and lost opportunity cost is semantics, and thus, compensatory damages are recoverable only in their raw and unadjusted amount. ECF 388 at 7–8 (citing *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, No. 10-cv-02516-WJM-KLM, 2014 WL 4651643, at *4 (D. Colo. Sept. 18, 2014)). While in earlier briefing on this issue, TPS cited cases that found a legal difference between prejudgment interest and a compensatory damage award adjusted for inflation, ECF 292 at 7–8, and I am inclined to view the two as different concepts, ECF 325 at 63:10–15, the majority of cases seem to favor Manville's position.

I note that at trial, TPS's economics expert, Dr. Frederick Warren-Boulton, presented three numbers for past damages to the jury, only one of which included an adjustment for inflation. ECF 374 at 1281:15–1284:14. The ultimate amount awarded by the jury was less than even the lowest, non-adjusted number proffered by Dr. Warren-Boulton. *Compare id. with* ECF 363. Thus, I find no indication that the one estimate which included an inflation adjustment "tainted" the jury's assessment of damages, ECF 408 at 4, nor that it created "an irresistible inference that . . . improper cause invaded the trial," *id.* at 4 n.1 (quoting *Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985)).

However, while I agree with TPS that there is a factual basis here to support the jury award and thus this argument does not warrant a new trial, in an abundance of caution, and to potentially avoid an expensive retrial or further proceedings on remand, I will impose a modest remittitur based on the only possible prejudice to Manville. *See Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1080 (10th Cir. 2008); *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1560 (10th Cir. 1991) (when the only potential error is the size of an award, remittitur is appropriate); *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1163 (10th Cir. 1985). Dr. Warren-Boulton's one number in which he used an inflation adjustment was his table that showed "Damages if TPS Reaches 40% Market Share." ECF 374 at 1281:15–1284:15; *see also* ECF 310 at 93 (Tbl. 6 of Dr. Warren-Boulton's Report stating unadjusted damages of $17,548,629). There, the unadjusted damages were $17,548,629, and the adjusted damages were $19,360,689. Thus, he applied an approximate 10.325% inflation adjustment. Reducing the verdict here by that same adjustment, the new, remitted damages amount is **$6,149,090.00.**

III.    **Whether TPS Should Be Required to Prove an Unlawful Exclusive Dealing Arrangement, Rather than "Unlawful" or "Anticompetitive Threats"**

Manville next argues that a recent decision from the Fifth Circuit requires that the jury in this case have been instructed that TPS must prove "unlawful *de facto* exclusive dealing rather than 'unlawful' or 'anticompetitive' threats." ECF 388 at 9 (citing *BRFHH Shreveport v. Willis Knighton Med. Ctr.*, 49 F.4th 520 (5th Cir. 2022)). TPS urges me to follow our own Circuit's instructions from the decision issued on the appeal in this case. I agree with TPS. This was not an exclusive dealing case. As I addressed extensively in my Order on Manville's Renewed JMOL, ECF 429, the evidence here did not entail any Manville exclusive dealing arrangements, but rather its alleged threats of withholding its full array of insulating products from any distributor that

bought TPS Calsil. I also agree with TPS that the evidence in the case indeed proved a *de facto* exclusive dealing arrangement between Manville and the distributors.

Under whatever term is used, the jury could reasonably have concluded from the evidence that Manville's conduct substantially foreclosed TPS from the market, and the instructions appropriately apprised the jury on TPS's burden of proof. The Tenth Circuit noted in this case, on a limited summary judgment record, that TPS had established, sufficient for a jury trial, that it had "little more than $2.3 million in TPS-calsil sales over three years to less than 10 (of 31) distributors"; that "TPS offered a better price for a higher-quality product"; "that the monopolist JM pressured its distributors into practical market exclusion to slow TPS's growth"; and that there was a correlation between "JM's threatening emails and TPS's meager market share." ECF 252 at 30. The record at trial was more developed on these points than was the record on the appeal.

Therefore, I reject Manville's proposition that TPS was required to prove unlawful *de facto* exclusive dealing and find this argument does not present a basis warranting a new trial.

IV.    **Whether the Jury Instructions Erroneously Allowed the Jury to Hold Johns Manville Liable for Lawful Conduct**

Again, as I addressed extensively in my Order on Manville's Renewed JMOL, ECF 429, the jury instructions repeatedly and thoroughly restricted the jury from awarding damages for nonactionable conduct. *E.g.*, ECF 364 at 39, 48–50, 56–57. The Parties were free to argue those instructions in view of the evidence presented at trial. Contrary to the argument in Manville's instant briefing, the jury instructions did not permit a finding of liability based on disparaging statements. It merely permitted, in one phrase, as authorized by the Tenth Circuit, that the jury may consider whether Manville's threats involved false and disparaging statements about TPS or its products. *See* ECF 252 at 26 n.19; ECF 364 at 49. There was no reversible error here.

Furthermore, as I stated in my other Order, no evidence of tying was presented to the jury. ECF 429. As I read the Tenth Circuit's opinion and the law generally, an unlawful tying arrangement would entail Manville having said: "Distributor X, buy our Calsil and you will have access to our other insulation products; if you do not buy our Calsil, you won't have that access." Indeed, the Tenth Circuit defined tying as: "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." ECF 252 at 35–36 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992)). An unlawful anticompetitive threat, on the other hand, would be Manville having said: "Distributor X, if you buy Calsil from TPS, you will have access to no Manville products." *See* ECF 252 at 40 n.27 (noting that testimony "that JM threatened to shift its Houston-based business from Distribution International to General Insulation" "helps support TPS's § 2 claim"). The Tenth Circuit found that proof of Manville tying "its non-calsil products to the purchase of JM calsil or the non-purchase of TPS calsil" would be admissible evidence of illegal conduct. *Id.* at 41. The Tenth Circuit further stated that "fact[s] supporting the exclusionary-conduct element based on the evidence of the monopolist's threatening to withhold its products from distributors" are relevant to TPS's claim. *Id.* at 28. More bluntly, "a monopolist engages in [illegal] exclusionary conduct by threatening distributors in this way." *Id.* at 28.

The only evidence at trial of the concept of tying was related to Manville's threats, *i.e.*, that if a distributor purchased TPS Calsil, then Manville will "not support" that distributor in the future. *See* ECF 373 at 1084:14–1090:23. If such evidence was barred by the Tenth Circuit's opinion, then I am not sure what iteration of a "threat" TPS was supposed to present to the jury. Otherwise, the Circuit should have affirmed summary judgment on the threats claim in its entirety, as I

originally did; that Court, however, did not. The case that was tried was the case the Circuit instructed to be tried. One need not look beyond the opening sentence of the Circuit's opinion: "**In this antitrust case, we consider whether the district court erred in granting summary judgment to a monopolist—a company supplying nearly 100% of the relevant market—that had threatened to stop selling needed products to its customers if they bought from a new market entrant offering a superior product for less money**." ECF 252 at 2 (emphasis added). Juxtapose this with Manville's argument: "Despite direction from the Tenth Circuit that tying was out of the case, the Court instructed the jury that it could find Johns Manville liable for anticompetitive conduct based on 'anticompetitive threats to withhold *JM's products* from its distributors.'" ECF 388 at 12 (emphasis in original). Manville is wrong, if binding precedent and plain words mean *anything*.

## V.    Whether the Court Made Prejudicial and Outcome Determinative Evidentiary Rulings

Finally, Manville contends that I made at least two evidentiary rulings that were both clearly erroneous and outcome determinative. ECF 388 at 13–19. As explained below, neither warrants a new trial.

### A.  Hearsay Evidence About Manville Threats

First, Manville argues I erred in admitting hearsay testimony regarding alleged threats Manville made to third-party distributors. *Id.* at 14–16; *see also* ECF 426. This issue was first raised in Manville's pretrial Motion in Limine #2. ECF 277. During oral argument on that motion at a pretrial Status Conference, TPS proffered that they would have a non-hearsay basis for the statements (*e.g.*, effect on the listener). ECF 325 at 16:24–22:11. On that basis, I denied the motion in limine without prejudice to raising it again at trial. *Id.* at 22:12–14.

At trial, distributor hearsay statements were not admitted. Plaintiff's witnesses were prepared to testify that numerous distributor representatives told them Manville would pull all its business from them if they purchased TPS Calsil. When those distributors did testify in open court, Manville's statements to the distributors in that regard were party admissions under Fed. R. Evid. 801(b)(2).[4] But when another witness, such as TPS President David Shong, wanted to testify about what those distributor witnesses *told him*, I excluded the distributor witnesses' statements as hearsay without an exception. *E.g.*, ECF 370 at 267:14–269:25, 270:20–271:9, 277:21–277:25, 278:5–9, 279:17–25, 285:11–290:1. The only element of those conversations I admitted was whether the name "Johns Manville" "came up." *E.g.*, *id.* at 270:18–19, 280:4–5; 296:15–297:20, 301:21–303:12, 307:2–308:6, 31:2–12; 314:1–19; 317:3–318:22; 320:19–321:10. Manville failed to object to almost all of these conversations. *Id.* Indeed, I could find only one instance in which Manville raised a hearsay objection, *id.* at 293:2–12, and that instance was not the first time evidence of such was discussed at trial. Nor did Manville ever request a continuing objection, as it did on numerous occasions concerning other matters presented at trial. *E.g.*, ECF 373 at 1185:16–22 (continuing objection to Dr. Warren-Bolton's damages analysis); *id.* at 1232:8–10; *id.* at 1232:19–21; ECF 374 at 1271:5–7. Evidence that the name "Johns Manville" "came up" in a conversation was either not inadmissible hearsay, or its admission was waived.

Further, in light of the numerous non-hearsay conversations between Manville and a distributor that were admitted at trial, any error in permitting a witness to identify whether "Johns Manville" "came up" during a conversation is harmless. "A harmless error is one that does not

---

[4] According to TPS, it originally had four distributor witnesses who were going to testify at trial about direct comments from Manville (eliminating the hearsay issue), but at least one refused to appear because of, in TPS's view, "JM . . . keep[ing] our witnesses from telling their story." ECF 378 at 11:8–16. *See also* ECF 264 at 19:18–20:21 (several months before trial, TPS informing the Court that some of its distributor witnesses expressed fear of retaliation if they testified).

have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to

whether it had such effect." *United States v. Collins*, 575 F.3d 1069, 1073 (10th Cir. 2009). I have

no such grave doubt here.

Manville argues that such hearsay evidence also came in through the deposition testimony

of Tim Scott, a former employee of a distributor known as GLT Fabricators.[5] ECF 388 at 14–15;

ECF 426 at 4. I will address each such instance listed by Manville in its Motion. ECF 388 at 15.

At page 33:10–34:3 of Mr. Scott's deposition,[6] the witness testified that statements about

distributors being threatened if they bought from Mr. Scott "forced me to take action." *See also*

ECF 369 at 238:5–240:7. I find this is admissible for the effect on the listener, a non-hearsay basis.

*Id.*; *see also United States v. Lambinus*, 747 F.2d 592, 597 (10th Cir. 1984) (finding statements

offered for their effect on listener or to explain the listener's later actions are not hearsay); *Zamora*

*v. Bd. of Educ. for Las Cruces Pub. Schs.*, 553 F. App'x 786, 790 (10th Cir. 2014) ("Statements

offered for the effect on the listener, however, are generally not hearsay."). At page 35:4–35:19,

Mr. Scott testified that statements from one distributor was "forcing us to change how we

potentially go to market as well." Again, I find this admissible for effect on the listener. At page

41:16–42:17 of Mr. Scott's deposition, the colloquy concerns why and how Mr. Scott had to

change the way his company did business because of the information he had received, so again,

---

[5] On the eve of trial, TPS informed the Court that Mr. Scott was scheduled to appear at trial but because of Manville showing him a communication between TPS and a distributor, which Mr. Scott had never seen and on which he was not copied, and which angered him, he no longer would cooperate with TPS or come to trial. ECF 378 at 5:3–8:3, 10:20–21. Similarly, a TPS witness named Kyle Romney, a former Manville employee, was informed through his counsel that if he testified, a negative document in his personnel file may come up. *Id.* at 9:5–11:16. Mr. Romney did testify at trial. ECF 351.

[6] Mr. Scott's witness testimony proceeded as portions of a pre-recorded video testimony. *See* ECF 351. As the trial transcripts do not re-transcribe deposition testimony entered into evidence through pre-recorded video, I cite to the pages and line numbers from Mr. Scott's deposition transcript provided to the Court by the Parties which corresponds to video testimony presented at trial.

this is admissible for effect on the listener. Finally, at 176:3–8 and 11–17 of Mr. Scott's deposition, once more, the entire topic of the discussion was why GLT Fabricators did not sell TPS Calsil to distributors, an effect on the listener. In any event, I have no "grave doubt" that these comments had a substantial influence on the outcome in light of the plethora of other supporting evidence admitted into trial for which there is no dispute as to admissibility.

Lastly, Manville alleges that Plaintiff's Exhibit 97—an email exchange between TPS's CEO Mr. Shong and a distributor—is a hearsay document that was erroneously admitted. ECF 388 at 15. In its instant Motion, Manville states I admitted the exhibit "because Johns Manville asked Mr. Shong whether TPS reached out to smaller distributors." *Id.* This is incorrect. At trial I overruled Manville's objection to the exhibit and admitted the email, finding the elements of Federal Rule of Evidence 803(6) were met. ECF 371 at 578:17–581:25. Manville does not dispute that ruling and, thus, I find its argument as to Plaintiff's Exhibit 97 inapposite.

**B. Heckman Tax Evasion**

Manville's final argument is that a new trial is warranted because "the court improperly excluded Jeff Heckman's felony conviction for tax fraud." ECF 388 at 16. Because evidence of the conviction would not have changed the outcome of this case, I reject this argument.

Jeff Heckman founded TPS and was a co-owner of the company. He started selling Calsil and believed it was a growth product. He brought on David Shong, formerly with Manville, to expand that part of the business. Mr. Heckman's role was, in any material sense, "background" to the events that underlie this case. Indeed, both TPS and Manville mentioned Mr. Heckman very briefly in opening, speaking only to the history identified above. *See* ECF 369 at 77:4–79:3, 98:4–99:4.

In 2014, Mr. Heckman pleaded guilty to one count of Willful Failure to Collect and Pay

Over Tax in violation of 26 U.S.C. § 7202. *See generally* ECF 274; ECF 371 at 627:11–628:12.

That provision of the Internal revenue Code states:

> Any person required under this title to collect, account for, and pay over any tax
> imposed by this title who willfully fails to collect or truthfully account for and pay
> over such tax shall, in addition to other penalties provided by law, be guilty of a
> felony and, upon conviction thereof, shall be fined not more than $10,000, or
> imprisoned not more than 5 years, or both, together with the costs of prosecution.

26 U.S.C. § 7202. TPS sought to have Manville prohibited from introducing evidence of Mr.

Heckman's conviction under Federal Rules of Evidence 401, 403, and 609(a). ECF 274. I granted

the motion subject to the underlying premise changing at trial. ECF 325 at 11:24–12:2. At trial,

Manville again sought introduction of the conviction, and I excluded it, finding that statutory

construction and persuasive case law supported the premise that a conviction under Section 7202

does not fit the admission requirements set out in Rule 609(a)(2). ECF 371 at 625:16–636:20. First,

Rule 609(a)(2) requires me to admit evidence of a criminal conviction for impeachment if I can

"readily determine that establishing the elements of the crime required providing . . . a dishonest

act or false statement." Based on the evidence before me, I could not so readily determine. Second,

in my research I found cases going both ways on whether the elements of a Section 7202 conviction

required proving a dishonest act or false statement. *See* ECF 371 at 634:11–635:9. I did not find a

compelling case for admitting the conviction, particularly in light of Heckman's minor role in the

facts of this case. I believe this outcome remains correct, and that Rule 609(a)(2) did not mandate

admission of Mr. Heckman's conviction.

Even so, admission of the evidence of Mr. Heckman's conviction would not have changed

the outcome of the trial. To this point, Manville offers only conclusory contentions: that my failure

to admit evidence of Mr. Heckman's conviction was clear legal error because it "would have

changed the jury's assessment of the credibility of Mr. Heckman—a key witness for TPS," ECF 388 at 17, and "the jury would have been much less likely to believe both Heckman's testimony and the claim asserted by TPS," ECF 408 at 16. I disagree. As noted above, Mr. Heckman's was a "background" role to the issues in this case. I have carefully reviewed Mr. Heckman's testimony at trial, and none of it had anything to do with alleged Manville threats (which was, of course, the entire thrust of the case) except the last question he was asked on direct: "Q: Did Johns Manville have anything to do with you being stymied [in meeting your business goals]? . . . A: Yes." ECF 371 at 651:22–652:3. The only objection to that question was a lack of foundation, which I overruled. *Id.* He did not testify about any fact (other than mentioned above) that was materially disputed. The "decision whether to admit or exclude evidence, is considered harmless unless a substantial right of [a] party is affected." *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999) (quotation omitted). "An error affects the substantial rights of a party if it had a substantial influence on the outcome or leaves one in grave doubt, as to whether it had such effect." *United States v. Jackson*, 54 F. App'x 925, 930 (10th Cir. 2003) (quotation omitted). In this situation, in light of what I have presented above, I have no doubt whatsoever that if the conviction had been admitted, it would not have changed the outcome in this case, let alone a "grave" doubt. Thus, the exclusion of such evidence fails to warrant a new trial.

## **CONCLUSION**

For the foregoing reasons, I **deny** Defendant Johns Manville Corporation's Motion for New Trial Under Federal Rule of Civil Procedure 59 [ECF 388].

It is further ORDERED that the damages awarded to TPS are **remitted** to **$6,149,090.00.**[7]

---

[7] This is the amount to then be trebled, as required under the Sherman Act.

DATED this 29th day of November, 2024, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
Chief United States Magistrate Judge