**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

---

MIDWEST INSULATION SERVICES INC.,
individually and on behalf of all others similarly situated,

        Plaintiff,

    v.

JOHNS MANVILLE CORPORATION,

        Defendants

Case No. 1:25-cv-00534-SKC

---

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

ARGUMENT ................................................................................................................... 3

I.      The Prior Verdict Against JM Puts it on Notice of Plaintiffs' Timely Claims ................... 3

II.     Plaintiffs Adequately Allege Anticompetitive Conduct ..................................................... 6

III.    Plaintiffs Adequately Allege Antitrust Injury ................................................................... 8

IV.     Midwest Adequately Alleges the Geographic Market ..................................................... 11

V.      Midwest May Assert Class Claims Under Other States' Laws......................................... 12

VI.     JM's Undeveloped Arguments That State Laws Meaningfully Differ Fail ..................... 14

VII.    Midwest Should Be Entitled to Amend If Necessary ...................................................... 15

CONCLUSION................................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
    2023 WL 7277313 (D. Colo. Sept. 29, 2023) ........................................................................ 12

*Auraria Student Housing at the Regency, LLC v. Campus Village Apartments, LLC*,
    843 F.3d 1225 (10th Cir. 2016) ....................................................................................... 6

*Brown v. JBS USA Food Co.*,
    2025 WL 918804 (D. Col. Mar. 26, 2025) ...................................................................... 5

*Champagne Metals v. Ken-Mac Metals, Inc.*,
    458 F.3d 1073 (10th Cir. 2006) ....................................................................................... 5

*Chase Mfg., Inc. v. Johns Manville Corp.*,
    2020 WL 1433504 (D. Colo. Mar. 23, 2020) .................................................................. 7

*Chase Mfg., Inc. v. Johns Manville Corp.*,
    84 F.4th 1157 (10th Cir. 2023) ................................................................................. 8, 11

*Collins v. Sonic Corp.*,
    2022 WL 2298194 (W.D. Okla. June 22, 2022) .......................................................... 15

*FTC v. Roomster Corp.*,
    654 F. Supp. 3d 244 (S.D.N.Y. 2023) ............................................................................ 3

*Gilley v. Atl. Richfield Corp.*,
    2002 WL 35645376 (S.D. Cal. May 6, 2002) ................................................................ 5

*Haynes v. Peters*,
    403 F. Supp. 3d 1072 (D.N.M. 2019) .......................................................................... 15

*Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*,
    353 F. Supp. 3d 678 (M.D. Tenn. 2018) ..................................................................... 14

*Humana Inc. v. Celgene Corp.*,
    2022 WL 123788 (D.N.J. Apr. 27, 2022) ....................................................................... 6

*In re Amitiza Antitrust Litig.*,
    2024 WL 4344887 (D. Mass. Sept. 30, 2024) .............................................................. 10

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) .......................................................................................... 12

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ........................................................................... 10

*In re Crocs, Inc. Sec. Litig.*,
   2013 WL 4547404 (D. Colo. Aug. 28, 2013)....................................................... 13

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012) ................................................................. 15

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011) ................................................................. 14

*In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*,
   2013 WL 5503308 (D.N.J. Oct. 2, 2013).............................................................. 8

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
   336 F. Supp. 3d 1256 (D. Kan. 2018) .................................................................. 7

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
   507 F. Supp. 3d 1289 (D. Kan. 2020), *aff'd*, 44 F.4th 959 (10th Cir. 2022)............................ 7

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................................. 10

*In re Nexium Antitrust Litig.*,
   968 F. Supp. 2d 367 (D. Mass. 2013) .................................................................. 5

*In re Packaged Ice Antitrust Litig.*,
   723 F. Supp. 2d 987 (E.D. Mich. 2010) ................................................................ 6

*In re Photochromic Lens Antitrust Litig.*,
   2011 WL 13141933 (M.D. Fla. Oct. 26, 2011) ...................................................... 10

*In re Polyurethane Foam Antitrust Litig.*,
   2015 WL 12748010 (N.D. Ohio Apr. 23, 2015) ...................................................... 5

*In re Qualcomm Antitrust Litig.*,
   292 F. Supp. 3d 948 (N.D. Cal. 2017) ................................................................. 14

*In re Remicade Antitrust Litig.*,
   345 F. Supp. 3d 566 (E.D. Pa. 2018) ................................................................... 5

*In re Se. Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014).............................................................................. 11

*Khalik v. United Air Lines*,
   671 F.3d 1188 (10th Cir. 2012) ........................................................................... 3

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997)........................................................................................... 5

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
    897 F.3d 88 (2d Cir. 2018) .................................................................................. 12, 13

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*,
    937 F.3d 1056 (7th Cir. 2019) ................................................................................... 5

*Morrison v. YTB Int'l, Inc.*,
    649 F.3d 533 (7th Cir. 2011) .................................................................................... 12

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012) ..................................................................................... 12

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
    2022 WL 2791201 (E.D. Cal. July 15, 2022) ........................................................ 11

*Pac. Steel Grp. v. Com. Metals Co.*,
    600 F. Supp. 3d 1056 (N.D. Cal. 2022) ................................................................. 11

*Power v. Sandbox Logistics, LLC*,
    2017 WL 1063467 (D. Colo. Mar. 17, 2017) ......................................................... 12

*Quint v. Vail Resorts, Inc.*,
    2022 WL 4550087 (D. Colo. July 8, 2022) ....................................................... 12, 13

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*,
    2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ....................................................... 14

*Smith v. Pizza Hut, Inc.*,
    2011 WL 2791331 (D. Colo. July 14, 2011) ......................................................... 13

*Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*,
    902 F.3d 735 (7th Cir. 2018) ..................................................................................... 9

*Tal v. Hogan*,
    453 F.3d 1244 (10th Cir. 2006) ................................................................................. 7

*The Indirect-Purchaser Rule and Cost-Plus Sales*,
    103 Harv. L. Rev. 1717 (1990) ................................................................................. 8

*Thomas v. Metro. Life Ins. Co.*,
    631 F.3d 1153 (10th Cir. 2011) .............................................................................. 13

*TV Communications Network, Inc. v. ESPN, Inc.*,
    767 F. Supp. 1062 (D. Colo. 1991), *aff'd*, 964 F.2d 1022 (10th Cir. 1992)............... 3

*United States v. Cornerstone Wealth Corp., Inc.*,
    549 F. Supp. 2d 811 (N.D. Tex. 2008) ..................................................................... 3

*Vizio, Inc. v. Funai Elec. Co.*,
   2010 WL 7762624 (C.D. Cal. Feb. 3, 2010)............................................................................ 10

Plaintiff Midwest Insulation Services Inc. ("Midwest") respectfully submits this response in opposition to Defendant Johns Manville Corporation ("JM")'s Motion to Dismiss the Amended Complaint (ECF No. 16, the "Motion").

## **INTRODUCTION**

A jury has already found that JM monopolized the U.S. market for calsil insulation. Entered on May 3, 2024, the verdict found JM monopolized the market at least through mid-2020. Since then, enabled by that same unlawful monopolization, JM has charged monopoly pricing on JM distributors passed on to Midwest, and other members of the proposed State Calsil Indirect Purchaser Damage Class, throughout the class damage period beginning in February 2021 and continues through the present under the well-established continuing violation doctrine.

JM's Motion tries to relitigate settled issues and impose standards that don't apply at the pleading stage. The claims are timely because Midwest seeks relief for purchases made during the limitations period. The Complaint plausibly alleges ongoing monopoly maintenance and overcharges passed through a short and transparent distribution chain. The prior verdict provides more than adequate notice under the pleading standards of the claims that JM possessed monopoly power and used it to exclude its only competitor.

JM's remaining arguments misstate the law. The Complaint adequately pleads anticompetitive conduct, antitrust injury, and a national geographic market consistent with the one found in the earlier case. And Midwest may assert class claims under other states' laws, as courts in this District and across the country have held, because those claims arise from the same core misconduct.

JM's motion should be denied in full.

## BACKGROUND

This case arises out of JM's unlawful and ongoing monopolization of the U.S. market for calcium silicate ("calsil") thermal pipe insulation, a market in which JM holds a 97% share. ECF No. 13-1 ("Amended Complaint" or "AC") ¶¶ 4, 31. Calsil is used to insulate high-temperature piping and equipment at industrial facilities, and no reasonably interchangeable substitute meets its specific physical and safety characteristics. *Id.* ¶¶ 24–29. JM sells exclusively through a small group of nationwide distributors, who in turn supply industrial contractors like Midwest. *Id.* ¶¶ 5, 14, 36, 41–42.

In 2018, Thermal Pipe Shields, Inc. ("TPS") entered the market with a lower-cost, ASTM-compliant product that some distributors believed was superior to JM's. *Id.* ¶¶ 6–8, 37–39. JM responded by threatening to withhold not just calsil but all JM products from distributors that purchased from TPS, and by spreading unfounded concerns about TPS's imported product, including false allegations of asbestos content. *Id.* ¶¶ 40–49. JM executives, acting under the direction of senior management, delivered threats to multiple major distributors across the country *Id.* ¶¶ 43–48.

In 2024, a jury found JM had violated Section 2 of the Sherman Act and awarded trebled damages to TPS for monopolization through the period through June 2020. *Id.* ¶ 1; *see also id.* Exs. A–C. JM appealed but has since settled the case, making the jury verdict the final word in the case. *See Chase Mfg., Inc. v. Johns Manville Corp.*, Nos. 24-1499, 24-1509, 25-1018 (10th Cir. May 9, 2025), ECF No. 19.

Plaintiff now brings this class action on behalf of indirect purchasers, including those who, like Midwest, bought JM calsil from distributors on or after February 19, 2021. *Id.* ¶¶ 14, 50, 60.

# ARGUMENT

## I.    The Prior Verdict Against JM Puts it on Notice of Plaintiffs' Timely Claims

JM's arguments as to the statute of limitations and collateral estoppel are both based on the mistaken premise that Midwest has not plausibly alleged that, within the last several years, JM continued to engage in the anticompetitive conduct established at trial, including the charging of monopoly prices. The principal question, under the longstanding application of Rule 8 of the Federal Rules of Civil Procedure, is whether Midwest's allegations were sufficient to put JM on "notice" as to the grounds for Midwest's claims. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1191-92 (10th Cir. 2012); *TV Communications Network, Inc. v. ESPN, Inc.*, 767 F. Supp. 1062, 1069 (D. Colo. 1991), *aff'd*, 964 F.2d 1022 (10th Cir. 1992). In the context here—where Midwest identifies and details the anticompetitive conduct established at trial—the Court may draw reasonable inferences in Plaintiffs' favor by considering the nature of that conduct, whether the relevant market remains the same, whether the defendant intentionally exercised monopoly power to charge monopoly prices, and whether the defendant's business presents opportunities to continue to engage in the same pricing practices.[1]

Under these standards, the allegations here easily put JM on notice that the theory of Midwest's claims are that, over the last several years, JM engaged in the same anticompetitive conduct established at trial. JM alleges, for example, the following:

---

[1] *Cf. United States v. Cornerstone Wealth Corp., Inc.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008) (in considering the likelihood that past violation of federal law under the FTC's purview has continued, the court may consider factors such as the "egregiousness of the defendant's actions," the "isolated or recurrent nature of the infraction," the "degree of scienter involved," and the "likelihood that the defendant's occupation will present opportunities for future violations"); *see, e.g.*, *FTC v. Roomster Corp.*, 654 F. Supp. 3d 244, 257 (S.D.N.Y. 2023) ("Defendants may have their own interpretation of the facts and circumstances, but it is not the court's role to choose between plausible interpretations at the motion to dismiss stage. It is enough that the FTC has plausibly alleged that a violation of the law is occurring.").

- The "market encompasses the sale in the United States of calsil thermal pipe insulation used by industrial facilities." AC ¶ 1; *accord id*. ¶ 24.

- JM "is the dominant purveyor of this calsil thermal pipe insulation in the United States with a 97% market share in the calsil relevant market," *id*. ¶ 4; *accord id*. ¶ 31, and "now owns and operates the only two remaining calsil factories in North America." *Id*. ¶ 30.

- JM "sells calsil to JM thermal-pipe-insulation distributors" who in turn "sell calsil to industrial users and insulation contractors," *id*. ¶ 5, and "JM makes much higher gross margins on calsil compared to its other thermal-insulation products (in which it faces competitive markets)." *Id*. ¶ 34.

- Midwest "has been purchasing substantial amounts of JM calsil from JM distributors over the last four years," *id*. ¶ 14, as "Distributors have continued to purchase JM's calsil despite earning significantly higher profits on calsil purchased from TPS." *Id*. ¶ 35.

- That is, "JM and TPS sell mechanical insulation products, including calsil, almost exclusively through distributors," *id*. ¶ 41, there "are five major mechanical insulation distributors that dominate nationwide, *id*., and "together these five distributors account for approximately 85% of mechanical insulation sales," *id*. ¶ 42.

- JM engaged in the exclusionary conduct at issue as detailed and illustrated in the Amended Complaint, *see, e.g.*, *id*. ¶¶ 33-49, and "[o]ver many years to the present, JM has continued to exclude calsil competition in the relevant market," and these "passed-on monopoly prices are substantially above competitive levels" and "caused by JM's monopolization." *Id*. ¶ 16. "JM's misconduct has materially caused passed-on antitrust price injury to Plaintiff as proposed class representative." *Id*. ¶ 19.

- In sum, the "JM exclusionary conduct maintaining monopolization continues," *id*. ¶ 55, as JM has maintained market power "to the present over the last several years by anticompetitively excluding competition," *id*. ¶ 56, such that "the JM calsil prices paid by Class purchasers are higher than competitive levels." *Id*. ¶ 57.

Midwest thus plausibly alleges that JM continued to engage in the anticompetitive conduct established at trial. *See, e.g.*, *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 585 (E.D. Pa. 2018) (finding that the indirect purchaser plaintiffs adequately alleged an "ongoing competitive scheme resulting in overcharges to Plaintiffs"). It follows that Midwest has alleged timely claims and that collateral estoppel precludes JM from arguing that its anticompetitive conduct was lawful.[2]

Midwest thus alleges, under the continuing violation doctrine, that it has paid supracompetitive prices over the last several years—because a new claim accrued each time a proposed Class member paid such a price. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *see also Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1090 (10th Cir. 2006); *In re Nexium Antitrust Litig.*, 968 F. Supp. 2d 367, 400 (D. Mass. 2013). In satisfaction of this doctrine, as shown above, Midwest "plausibly alleges" that the anticompetitive conduct at issue "continued into the limitations period." *Brown v. JBS USA Food Co.*, 2025 WL 918804, at *20 (D. Col. Mar. 26, 2025). Midwest does not allege, and its allegations do not remotely permit

---

[2] *See, e.g.*, *Gilley v. Atl. Richfield Corp.*, 2002 WL 35645376, at *3 (S.D. Cal. May 6, 2002) (in case brought by indirect purchasers, giving collateral estoppel effect to the prior resolution that "there was a conspiracy by the petroleum companies to limit supply and raise prices," notwithstanding that "the impact of conspiratorial conduct of gas companies would be different on individual purchasers as opposed to wholesale purchasers"); *see also McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1064 (7th Cir. 2019) (in case brought by indirect purchasers, noting that the prior judgment against the defendants may have "preclusive effect in this second suit"); *In re Polyurethane Foam Antitrust Litig.*, 2015 WL 12748010, at *4 (N.D. Ohio Apr. 23, 2015) (in case brought by indirect purchasers, alluding to the scheduling briefing "to determine the collateral estoppel effect of the Direct Purchaser (non-class) trial").

the inference, that JM's anticompetitive conduct resolved at trial was "final" as of that point. *Auraria Student Housing at the Regency, LLC v. Campus Village Apartments, LLC*, 843 F.3d 1225, 1248 (10th Cir. 2016).[3]

## II.    Plaintiffs Adequately Allege Anticompetitive Conduct

First, JM argues that Plaintiff does not sufficiently allege that JM took steps to "maintain its monopoly after 2019." (Mot. at 11). This repetitive argument fails for the same reasons its statute of limitations arguments fail, *see* pp. 2-5, but also because there is a jury verdict of monopolization through at least June 2020. (Mot. at 1). Drawing all reasonable inferences from that verdict in Midwest's favor and taking all well-pleaded factual allegations as true, it is plausible the anticompetitive conduct continued, including monopoly overcharging, and had effects into 2021 and to the present. *See, e.g.*, AC ¶¶ 55-57. At the pleading stage, courts do not demand the kind of precise temporal alignment of misconduct JM demands here. Indeed, courts routinely find allegations that about the mere *existence* of government investigations sufficient to state a claim that the underlying conduct occurred. *See, e.g., In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008 (E.D. Mich. 2010). A verdict that JM monopolized the market in a period *at least* through June 2020, coupled with its continuing high market share, AC ¶ 4, compels the inference at the pleading stage that its willful monopoly maintenance and monopoly overcharging for each class transaction continued after that.  *See* pp. 2-5.

---

[3] Midwest is to address JM's argument as to collateral estoppel in even greater detail in the Court-ordered briefing on whether and to what extent that doctrine bears on the scope of discovery in this matter. *See* ECF No. 27. It bears noting for purposes here that, *if* JM's conduct in the last several years has not been the same as its prior conduct, but nevertheless caused supracompetitive pricing, as Midwest alleges, then Midwest's claims remain timely. In addition to the precedent cited above, *see also, e.g., Humana Inc. v. Celgene Corp.*, 2022 WL 123788, at *5 (D.N.J. Apr. 27, 2022) (for purposes of the statute of limitations, a purchaser "is injured only when it purchases a good or service at a supracompetitive price").

Second, JM argues (at 11) that Midwest made "conclusory allegations that JM engaged in anticompetitive conduct" without pleading the "what," "when," or "to whom" the threats were made. JM's attempt to impose an inappropriate particularity pleading standard[4] flatly ignores the verdict and evidence supporting the allegations, supported by references to specific emails, like "[t]o coerce distributors not to buy TPI calsil JM employees told them JM would not sell its products to them." AC ¶ 45. Notably, in the case JM cites in support of this argument, the defendant faced no ongoing or prior investigation or verdict for antitrust violations. *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006).

Third, JM argues (at 11-12) that Midwest fails to satisfy a six-factor "disparagement" test. But "[t]he Tenth Circuit has not decided whether a plaintiff must establish all six factors . . ." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.,* 507 F. Supp. 3d 1289, 1359 (D. Kan. 2020), *aff'd,* 44 F.4th 959 (10th Cir. 2022). A court has already found that JM's disparagement—that a competitor's imported calsil was subpar and may have asbestos—passes the bar for this fact-intensive test. *Chase Mfg., Inc. v. Johns Manville Corp.*, 2020 WL 1433504, at *14 (D. Colo. Mar. 23, 2020) ("Given the seriousness of allegations of asbestos, especially in the industrial insulation community, and the fact that all of Defendant's disparagement relates to the safety and quality of Plaintiff's calsil, it is more than plausible that such statements are not readily susceptible to neutralization.").

In any event, JM reads the complaint too narrowly. The allegations do not need to rise to the level of a "freestanding exclusionary-conduct theory" to be supportive (and discoverable) for an antitrust claim. *See, e.g.*, *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 n.19

---

[4] "Antitrust cases are not subject to a standard requiring heightened fact pleading of specifics." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1286 (D. Kan. 2018) (internal quotation marks omitted).

(10th Cir. 2023).

### III.    Plaintiffs Adequately Allege Antitrust Injury

JM's argument that Midwest has not alleged injury depends on entirely ignoring both (1) the jury verdict that JM monopolized this very market and (2) the short supply chain pled in this case. JM claims that Midwest only made "barebones assertions" of paying higher prices and it did not adequately explain how JM's overcharges were passed further along to "some unspecified point down the supply chain." Mot. at 12-13.

But at the pleading stage it is a reasonable inference that distributors pass on supracompetitive monopoly prices to indirect purchasers like Midwest, who are thus harmed. "[G]eneral economic principles suggest that indirect purchasers often suffer the greatest harm from illegal overcharges." *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *13 (D.N.J. Oct. 2, 2013) (collecting cases showing that the pleading standard for injury is met even if there are not precise allegations of how the overcharge is passed in a chain). This is based on decades-old, well-established economic theory. Herbert Hovenkamp, *The Indirect-Purchaser Rule and Cost-Plus Sales*, 103 Harv. L. Rev. 1717, 1726 (1990) ("[E]conomic analysis indicates that at least some of the overcharge is passed on . . . . In general, it appears that more of the monopoly overcharge is passed on than absorbed.").

JM's cited cases do not run counter this economic theory or the relevant pleading standards. Nor do they even address the scenario here, where the defendant who was already found by a jury guilty of monopolizing the market at issue and the relevant supply chain is narrow, given Midwest and other putative class members are mostly buying one step down the chain, from "JM United States distributors, wholesalers, or other resellers." AC ¶ 60; *see also id.* ¶ 5 (describing how JM sells to distributors who sell to "indirect purchasers"), *id.* ¶ 14 (describing how Midwest bought from "JM distributors over the last four years"). On top of that, there are only "five major

8

mechanical insulation distributors that dominate nationwide" that account for **85%** of sales. *Id.* ¶¶
41-42.

JM's reliance on *Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*, only
underscores why Midwest's allegations are sufficient. While JM cites the district court opinion
(without even referencing the appeal), the Seventh Circuit drew an explicit distinction between a
viable claim—where plaintiffs alleged injury from purchasing steel products directly from
distributors who had purchased them from the defendants—and an implausible one, where the
alleged injury stemmed from steel that had been incorporated into complex downstream products
after multiple stages of manufacturing and distribution. 902 F.3d 735, 744 (7th Cir. 2018). This
case fits the former scenario: Midwest alleges that it purchased thermal pipe insulation directly
from JM's distributors—one step removed from the monopolist. AC ¶¶ 5, 14, 60. That short and
traceable supply chain aligns with the type of injury court deemed actionable and stands in stark
contrast to the attenuated theory rejected there.

The Complaint alleges JM's monopolization "has materially caused classwide antitrust
price injury passed on to members of the State Calsil Indirect Purchaser Damage Class. Such
supra-competitive pricing is the *type of concrete injury the State monopolization laws are plainly
intended to prevent.*" AC ¶¶ 65-66 (emphasis supplied). Thus, the class members are directly
injured by the passed on monopoly pricing under state indirect purchaser statutes.

JM attempts to inappropriately impose <u>federal</u> prudential antitrust standing and injury
concepts to these <u>state</u> law claims. The nature of the overcharge and market here suffice to show
the necessary directness between JM's conduct and the injury Midwest suffered under the federal
standard. However, the direct purchaser standard applied by *Illinois Brick* to federal claims is not
required for state law claims. JM's own cited case erroneously imposing this standard recognized

in **2011** that "[t]here is a split in authority as to whether the [*Associated General Contractors*] test applies to state law antitrust claims brought under state statutes intended to repeal *Illinois Brick.*" *In re Photochromic Lens Antitrust Litig.*, 2011 WL 13141933, at *4 n.8 (M.D. Fla. Oct. 26, 2011). But by 2025, it is recognized that the demanding federal test for directness of injury is generally incompatible with state laws permitting indirect purchaser antitrust claims*. See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 815 (N.D. Ill. 2017) ("*Illinois Brick* repealers work to save indirect purchaser damages suits, even from application of the [*Associated General Contractors*] factors."); *In re Amitiza Antitrust Litig.*, 2024 WL 4344887, at *2 (D. Mass. Sept. 30, 2024) ("[I]t would be quite illogical for *Illinois Brick*-repealer states to reject *Illinois Brick* (and in some cases enact provisions to limit duplicative damages for indirect buyers), just to apply *Illinois Brick*'s analysis to bar claims by indirect buyers under *ACG*'s prudential standing grounds."). And JM's citation to a case applying *Associated General Contractors* to <u>federal</u> claims is similarly irrelevant. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 223–24 (S.D.N.Y. 2019).

Finally, JM's argument (at 12) that Midwest's allegation that it paid supracompetitive prices resulting from monopoly maintenance is "conclusory" both (1) flips the relevant test on its head and (2) ignores the allegations of exclusionary conduct and resulting willful maintenance of market power that leads to the supracompetitive prices alleged under the continuing violation doctrine. JM effectively asks the Court to turn the elements of market power on its head and require a plaintiff to plead supracompetitive pricing to show injury.

Further, this would conflict with holdings that supracompetitive pricing is just one method to show the required market power to state a claim. *See, e.g.*, *Vizio, Inc. v. Funai Elec. Co.*, 2010 WL 7762624, at *7 (C.D. Cal. Feb. 3, 2010) ("[M]arket power need not be proved through indirect

evidence of market share. Market power may also be proven through direct evidence, such as supracompetitive prices and restricted output."). It is inappropriate to take just one method required to infer market power and reverse its logic to create a nonexistent requirement to plead facts of supracompetitive pricing to create standing.

At the pleading stage, plausible contextual allegations describing exclusionary conduct, such as those that exist here, suffice to support market power enabling antitrust price injury. *See, e.g.*, *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, 2022 WL 2791201, at *7 (E.D. Cal. July 15, 2022) ("Direct evidence consists of proof of an injury . . . . Circumstantial evidence, the more common type of proof, pertains to the structure of the market.").

## IV.    Midwest Adequately Alleges the Geographic Market

"The purpose of defining a geographic market is to reveal whether, or to what extent, market power exists." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014). Midwest alleges that the relevant geographic market for calsil products is the entire United States, because the demand for it is national. AC ¶ 29. This market definition is consistent with the competitor lawsuit against JM for the market for calsil products *Chase Mfg.*, 2020 WL 1433504, at *6 (" . . . Defendant raises no issues with the Plaintiff's allegations as to geographic scope"). And it is the market where JM undoubtedly holds market power, as it holds a 97% market share. *See* AC ¶ 4; *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1073 (N.D. Cal. 2022) ("[A] plausible allegation of sufficient market share is usually sufficient to withstand a motion for dismissal").

Given the low pleading threshold for defining a geographic market—and JM's overwhelming share in a broadly defined market that JM cannot argue was cherry-picked— Plaintiff's allegations are sufficient. *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1070 (N.D. Cal. 2022) ("But at this early stage in the litigation, Pacific Steel is not required to plead the relevant geographic market with specificity.") The only reason the geographic market

was found insufficient in JM's cited case was because "state laws governing licensing and practice of surgical assistants and surgical technologists vary materially from state to state" which "call into question whether the various certificates compete on substantial parity with each other, nationwide." *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 2023 WL 7277313, at *6 (D. Colo. Sept. 29, 2023). There is nothing in the pleadings suggesting that commodity calsil products have anything like this problem. In the end, it defies logic to say the geographic market is implausible when JM owns all but owns the entire country's market share.

## V.     Midwest May Assert Class Claims Under Other States' Laws

Although the Tenth Circuit has not squarely addressed the issue, the growing consensus among federal courts—including in this District—is that a named plaintiff may assert class claims under the laws of states where they do not personally reside, so long as they have Article III standing. *See, e.g.*, *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 93–95 (2d Cir. 2018); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011); *Quint v. Vail Resorts, Inc.*, 2022 WL 4550087, at *2 (D. Colo. July 8, 2022); *Power v. Sandbox Logistics, LLC*, 2017 WL 1063467, at *1 (D. Colo. Mar. 17, 2017). These courts hold that once a named plaintiff alleges a concrete injury traceable to the defendant, whether they can recover under the laws of additional states is a merits or Rule 23 question—not a standing defect.

This approach is grounded in the principle that claims by absent class members can be asserted where they "implicate the same set of concerns" as the named plaintiff's claims *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012); *see also Langan*, 897 F.3d at 95. Courts in this District have applied that logic in securities cases, holding that differences in legal rights among class members do not defeat class standing so long as the underlying conduct is common. *See In re Crocs, Inc. Sec. Litig.*, 2013 WL 4547404, at *2 (D. Colo.

Aug. 28, 2013) (citing *NECA* and explaining such arguments implicate Rule 23, not standing). Consistent with these cases, because Midwest itself concededly has Article III standing and the claims arise from the same conduct and set of concerns, they are better addressed at class certification.

Defendants' reliance on cases like *Smith v. Pizza Hut, Inc.*, 2011 WL 2791331 (D. Colo. July 14, 2011), is misplaced. These older cases predate the modern line of authority and improperly conflate standing with class certification. As *Langan* explains, treating variations in state law as jurisdictional rather than merits-based "would collapse the class certification inquiry into the merits and thwart the efficiencies Rule 23 is meant to promote." 897 F.3d at 93.

More recently, this District Court in *Quint* directly rejected the premise that a named plaintiff's inability to recover under another state's law is a standing problem at all. 2022 WL 4550087, at *2 ("That … does not mean they have not alleged an injury … [i]t just means they would not be able to obtain any such favorable decision. But that is 12(b)(6), not standing.").

Tellingly, Defendants cite <u>none</u> of the contrary authority, relying solely on *Smith* and similar older cases while ignoring more recent, directly adverse decisions from both this District and several Courts of Appeals.[5] This selective presentation—whether by oversight or strategy—sandbags Midwest by depriving it of a fair opportunity to respond to any purported concerns with the reasoning and logic of those more recent decisions. JM's argument should be rejected.

---

[5] Defendants also misleadingly quote *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1159 (10th Cir. 2011) in a footnote, omitting that the case addresses *appellate* standing. The plaintiff there "was not aggrieved by the court's denial of leave to amend—the only person aggrieved was the potential new plaintiff, who did not appeal the order" and would have had standing on appeal. *Id.*

**VI.    JM's Undeveloped Arguments That State Laws Meaningfully Differ Fail**

JM argues in a conclusory fashion with almost no analysis or exposition that various state law claims fail because of the alleged "unilateral conduct" and lack of "interstate effects." (Mot. at 14-15). These arguments largely fail.

**Unilateral conduct.** JM paints with too broad a brush when claiming certain state do not permit unilateral monopolization claims. Excepting Kansas, coercive and exclusive dealing arrangements with customers, such as that alleged here, AC ¶¶ 41-49, are actionable. *See, e.g.*, *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 974 (N.D. Cal. 2017) (allegations that defendant forced customers to "adhere to unreasonable and supra-competitive licensing terms by threatening to withhold" supply was not "unilateral" and stated a claim under Cartwright Act); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, 2018 WL 7197233, at *27-*29 (S.D.N.Y. Dec. 26, 2018) (similar as to New York and Tennessee but noting that Kansas requires explicit allegations of "conspiracy").[6]

**Intrastate Effects.** JM also overstates the quantum of interstate effects required to plead claims in most states. Excepting Alabama, courts routinely find rote allegations of sales and effect in a state to suffice at the pleading stage. *See, e.g., Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678, 695 (M.D. Tenn. 2018) ("As for . . . West Virginia, "the 'intrastate effects' requirement is met at the pleading stage by a plaintiff's allegations, like those in the instant case, claiming that the anticompetitive conduct caused supracompetitive price effects in the relevant jurisdictions."); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 408 (S.D.N.Y. 2011) ("Pleadings involving similar allegations of intrastate conduct along with

---

[6] Because the Amended Complaint does not allege any conspiracy, Plaintiff respectfully requests to withdraw, without prejudice, the claim as to Kansas at this time.

conduct throughout the United States in nationwide class actions have survived motions to dismiss in the face of this very argument" regarding Michigan, West Virginia, and Wisconsin); *see also In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012) (claims under Mississippi, New Hampshire, and North Carolina because "they allege that the putative Plaintiffs located in [those states] had to pay higher prices for DDAVP because of Defendants' alleged deception").

## VII.    **Midwest Should Be Entitled to Amend If Necessary**

JM's request for dismissal with prejudice simply presumes futility without any analysis and is premature before the Court's ruling. To the extent that the Court finds a pleading deficiency, Midwest requests an opportunity to amend if it can show amendment would not be frivolous. Thus, this case differs from JM's cited case where (1) the plaintiff did not oppose defendant's request for dismissal with prejudice and (2) there were no apparent contested factual issues regarding the number of text messages defendant sent, only their legality under telemarketing law. *See Collins v. Sonic Corp.*, 2022 WL 2298194, at *4 (W.D. Okla. June 22, 2022). Given the Tenth Circuit's stated preference to "provide litigants the maximum opportunity for each claim to be decided on its merits," it is premature to dismiss with prejudice before assessing the standard Rule 15 factors for a possible amendment at the appropriate time. *See, e.g.*, *Haynes v. Peters*, 403 F. Supp. 3d 1072, 1084-85 (D.N.M. 2019) (quotation marks omitted) (collecting cases).

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny JM's motion to dismiss in its entirety. If the Court identifies any pleading deficiency, Plaintiff respectfully requests leave to amend.

Dated: May 16, 2025
      New York, NY

Respectfully Submitted,

*/s/ Edward Normand*
Edward Normand
**FREEDMAN NORMAND FRIEDLAND LLP**
10 Grand Central
155 E. 44th Street, Suite 915
New York, NY 10017
Telephone: (646) 494-2900
Email: tnormand@fnf.law

Richard Cipolla
**FREEDMAN NORMAND FRIEDLAND LLP**
25 Franklin Street, 26th Floor
Boston, MA 02210
Telephone: (617) 374-3700
Email: rcipolla@fnf.law

R. Stephen Berry
**BERRY LAW PLLC**
1100 Connecticut Avenue, NW, Suite 645
Washington, DC 20036
Telephone: (202) 296-1212
Email: sberry@berrylawpllc.com

*Counsel for Plaintiff*